Opinion
 

 WERDEGAR, J.
 

 Defendant Peter Sakarias was convicted of first degree murder in the death of Viivi Piirisild, with special circumstances of murder in the commission of robbery and burglary (count 1; Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17)),
 
 [1]
 
 and of robbery (count 2; § 211), two counts of burglary (counts 3 and 4; § 459), theft of telephone services (count 5; § 502.7, subd. (a)(1)), and concealing and selling stolen property (count 6; § 496, former subd. 1, now subd. (a)). After a trial on penalty and denial of
 
 *609
 
 defendant’s motions for new trial and modification of penalty (§ 190.4, subd. (e)), defendant was sentenced to death for the murder and to a determinate term of 18 years, stayed, for the remaining counts. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.
 

 Facts
 

 Defendant was accused and convicted of killing Viivi Piirisild in her North Hollywood home on July 12, 1988. Piirisild was stabbed, cut and bludgeoned with a knife and hatchet by defendant and his friend, Tauno Waidla. Waidla was tried separately before defendant’s trial and was also convicted of the murder and sentenced to death.
 

 Guilt Phase Evidence
 

 Prosecution
 

 Defendant, Waidla, Viivi Piirisild and Avo Piirisild, the victim’s husband, were all of Estonian background. The Piirisilds were active in the Baltic American Freedom League, an organization seeking to focus public attention on the Soviet occupation of Estonia, Latvia and Lithuania and to help immigrants from those states. Through that group, they met defendant and Waidla, who had defected together from the Soviet Army and had come to the United States in 1987. Avo Piirisild took defendant and Waidla to the Estonian House, and the Piirisilds had the men to dinner. Defendant later moved to Georgia. With Viivi Piirisild’s assistance, Waidla obtained a job in Washington, D.C., but, when that did not work out, he returned to the Los Angeles area. Because he had no place else to stay, the Piirisilds invited him to live at their home, which he did for about a year.
 

 Waidla performed various chores in exchange for his room and board, including remodeling work on the guesthouse in which he stayed. At some point, Viivi Piirisild said that if Waidla finished his work around the house he could have an inoperable Triumph Spitfire sports car that was in the backyard. Although unhappy with his wife’s promise, Avo Piirisild agreed to uphold it.
 

 One day in early 1988, defendant visited the Piirisild house while the Piirisilds’ daughter, Rita Hughes, was also visiting. In conversation with Hughes and Waidla, defendant said he preferred life in Estonia because there one could take advantage of the corrupt government to get rich. He spoke with disdain of “working stiffs” he had met in the United States, who worked all their lives only to achieve material success when they were old. He and Waidla, he said, would instead go to Hawaii and live on the beach.
 

 
 *610
 
 In May 1988, Waidla refused to do any more work on a sprinkler system he was installing in the yard and demanded $3,000 or $4,000 from Viivi Piirisild, threatening otherwise to report to the building department the existence of the guesthouse, which had been built or rebuilt without proper permits. Viivi telephoned Avo at his office; they agreed to tell Waidla to leave. Although angry and making threats against Avo, Waidla packed his belongings, and defendant picked him up. Sometime after Waidla left, Viivi received a postcard from him and defendant with a picture of a snake on it.
 

 On the weekend of July 4, 1988, the Piirisilds went to their second home, a cabin in Crestline. On departing, they left the cabin in a clean and orderly state. On the afternoon of July 4, after the Piirisilds returned to their North Hollywood house, defendant and Waidla came by unannounced in a pickup truck. When Avo answered the door, Waidla said he wanted the Triumph. Avo told him he did not have the pink slip at home, could not get it that day, and was leaving the next day for a two-week business trip. Waidla said they needed money for gas to get to San Francisco. Avo did not give them money, but went with them to the gas station and filled the tank on his credit card, after which they drove him home and left.
 

 During July 5-10, telephone calls were made from the Crestline cabin to various places in North America and Europe, even though Viivi was in North Hollywood and no one else had permission to stay at the cabin. When, after Viivi’s death, Avo accompanied police to the cabin, he found it messy and disordered. There were signs of forced entry. Defendant’s fingerprints, along with Waidla’s, were found in the cabin, although defendant had never accompanied the Piirisilds there. A storage area underneath the cabin in which the Piirisilds kept a hatchet, among other equipment, had been broken into. A radio telephone was missing, and was later recovered from a pawnshop where defendant had pawned it on July 11.
 

 On July 8, Viivi Piirisild telephoned FBI Special Agent George Charon. She told him defendant and Waidla had called her, asking if they could come to her house to retrieve some things they had left there. Viivi told Charon she was certain they had not forgotten anything and had told them not to come over, but that their call concerned or frightened her, especially because they knew Avo was out of town. At Charon’s suggestion, Viivi agreed she would call 911 if defendant and Waidla came to her house.
 

 On July 11, Viivi talked by phone to her daughter, Hughes. Hughes offered to come stay with her mother while Avo was gone, but Viivi declined, saying it was not safe for Hughes to come home. Over the next few days Hughes called several times but the phone went unanswered.
 

 
 *611
 
 On the morning of July 12, 1988, Viivi Piirisild went to the dentist. She left there around 10:45 a.m. The same morning, Donald Hussey, a neighbor of the Piirisilds, saw two men, whom he later identified as defendant and Waidla, walk past his house toward the Piirisilds’ house. They gave him “hard looks” as they passed. About 45 minutes later Hussey saw the two men leave the Piirisilds’ front yard and walk back past his house, now carrying several shopping bags, and without the jackets they had been wearing earlier. When they passed Hussey, defendant asked where Hart Street was. Hussey told them it was back in the direction from which they were coming, but they continued in the same direction they were going.
 

 When Avo Piirisild was unable to reach Viivi by telephone for a few days, he asked Bernard Nurmsen, a friend, to check on her. Nurmsen went to the house on July 14, entered and discovered Viivi’s body lying on the floor of her bedroom.
 

 Police detective Victor Pietrantoni, with his partner David Crews, investigated the crime scene. The back door showed signs of forced entry: the glass was broken and the deadbolt cover unscrewed. From the odor of decomposition and the condition of Viivi Piirisild’s body, Pietrantoni estimated she had been dead two or three days.
 

 The detectives found bloodstains on the floor of the living room, including a dried pool of blood covered by a throw rug, and on the living room walls, including an area behind a sofa, where they also found unopened, bloodstained mail. From blood drops on the hall carpeting and the depressed nap of the carpet itself, Pietrantoni inferred Viivi’s body had been dragged from the living room down the hall to the bedroom, where it was found lying on the bedroom floor, partly covered with bedclothes. Blood spatters were on the bedroom ceiling and wall, and on a photograph standing on the bureau. From the fact some of these spatters formed an approximate line and from the nature of the victim’s injuries, Pietrantoni inferred the spatters were the result of blood flying off a weapon as it traveled in an arc. There were also spatters along a piece of furniture near Viivi’s head, consistent with blows being struck to her head as she lay on the floor.
 

 Detective Pietrantoni saw many blunt force and cutting-type injuries on the victim’s body, most to the front and top of her face. Based on the injuries and the physical evidence, he opined she had been first attacked shortly after entering the house, had lain bleeding for several minutes in the living room, and then had been dragged to the bedroom, where she was again attacked.
 

 Dr. James Ribe, the deputy medical examiner who performed the autopsy on Viivi Piirisild, testified to her wounds. Viivi had been stabbed four times
 
 *612
 
 in the left chest with a single-edged knife. Two of those wounds passed through internal organs and were potentially fatal. She had two chopping wounds to the forehead and one on the top of her head, which penetrated the skull. Because the two forehead wounds were nonhemorrhagic, Dr. Ribe concluded they were probably inflicted near or after the victim’s death. The higher chopping wound was hemorrhagic and had been inflicted with “tremendous” force. Viivi also suffered at least five blunt force impacts to the head and neck, which fractured her skull and facial bones, knocked out her teeth and broke her larynx. The facial injuries were inflicted by “powerful blows with a heavy, blunt object.” Dr. Ribe attributed Viivi’s death to the combination of all her wounds, rather than to any single one of them.
 

 At 2:30 p.m. on July 12, 1988, the day of Viivi Piirisild’s death, defendant sold some of her jewelry to a pawnshop. Also on July 12, Viivi’s TWA credit card was used to purchase two tickets on a flight to New York, which left early the next morning. Her J. C. Penney card was used to buy clothing and jewelry in New York on July 14 and 15, and on the same days her telephone calling card was used for a large number of long-distance and foreign calls from New York. According to a handwriting expert, defendant had signed the pawnshop receipt and had written Viivi’s address on the Penney’s charge slip.
 

 In late August 1988, defendant was apprehended by border patrol agents in upstate New York, at the Canadian border. Detectives Pietrantoni and Crews went to New York to interview him and Waidla, who had also been arrested nearby. In his initial interview, defendant admitted breaking into the Crestline cabin and staying there for several days with Waidla, but denied being at the Piirisilds’ North Hollywood home on July 12. When Detective Pietrantoni told him he had been seen and identified by a neighbor, however, he admitted that he and Waidla had broken into the house, waited for Viivi, and killed her with a knife and hatchet (taken from Crestline) when she came home.
 

 The next day defendant repeated his confession in a tape-recorded interview. According to defendant, Viivi Piirisild had been spreading harmful rumors about him—that he was using drugs, that he had stolen weapons from a security company where he worked—as a result of which others in the Estonian community were no longer willing to help him. He and Waidla had gone to stay in the Crestline cabin until Avo came back, so Avo could give Waidla the car, but they then thought Avo might again find a way to avoid giving Waidla the pink slip, and they also began running out of food. They called several people in Canada and the United States, but no one would give them more money. They decided to kill themselves, rather than
 
 *613
 
 “live like bums,” but then thought, “if we kill ourselves then Piirisilds, both of them, they are going to laugh on us for the rest of their lives.” Instead, they decided to confront Viivi and frighten her into giving them the car.
 

 On the way down from Crestline, they were hungry and angry. Defendant felt that he did not care if he got caught “on the next block, you know, with hammer in my hand. . . . [B]efore I gonna die I have to eat something and she is not gonna see my funeral, that was the only reason.” Defendant felt “very strongly” that Viivi had wronged him and Waidla by separating them and by not showing Waidla respect. They brought Scotch tape, a screwdriver, a kitchen knife and a hatchet with them to the Piirisilds’ house, but “even until the last moment we didn’t know that we were going to kill her. We just tried to get some money for food, I don’t know what we were thinking.”
 

 After they saw Viivi leave, defendant and Waidla broke into the house through the back door, using the Scotch tape to dampen the sound of the shattering window, a technique defendant had learned from a book. They “were going to take something from the house and get away, but something changed in the minds and we said, you know, ... I didn’t have any food, I didn’t have any job and that’s why, I mean like we didn’t care about my life anymore. Even if I’m getting killed after five more minutes, but she is dead, you know. Also.”
 

 Once in the house, defendant ate some food while Waidla searched for jewelry. They took a ring and necklace, then “started waiting for Viivi.” When Viivi came in the door, Waidla hit her on the head with the hatchet. She fell, begging Waidla to stop. Waidla then said to defendant, “What you waiting for, stab her.” Defendant stabbed Viivi “five times or more” in the chest with the knife, until the handle broke off. Viivi’s body was still “shaking” when he stabbed her. Defendant retrieved the blade, reassembled the knife and put it in his pocket. Waidla then hit her “a couple more times.”
 

 The pair dragged Viivi to the bedroom and covered her with a blanket, then returned to the kitchen. Waidla handed the hatchet to defendant and told him to go hit her again. Defendant went back into the bedroom and struck Viivi on the top of her head two times. He then returned to the kitchen and ate some liverwurst from the Piirisilds’ refrigerator.
 

 Defendant and Waidla took two telephones and one of Avo’s shirts, put them in plastic bags from the kitchen together with their bloody jackets and the hatchet, and left by the front door. After disposing of the weapons and bloody jackets in a park garbage can, they pawned the jewelry, took a bus to
 
 *614
 
 the airport, and charged two tickets to New- York. In New York, they got financial help from other Estonians who, defendant asserted, knew what they had done but also disliked Viivi. Eventually someone gave them money to go to Canada.
 

 While flying back to Los Angeles with Detective Pietrantoni, defendant said he was surprised he and Waidla had been caught, because while inside the Piirisild house they had worn rubber gloves they got from a kitchen cabinet.
 

 Defense
 

 The defense called no witnesses in the guilt phase.
 

 Penalty Phase Evidence
 

 Prosecution
 

 Detective Pietrantoni testified that, when defendant was arrested on August 25, 1988, he was carrying a loaded nine-millimeter semiautomatic pistol as well as a survival-type knife.
 

 Edward Nordskog, a detective with the Los Angeles County Sheriff’s Department, testified that in October 1988, while investigating gang activity in the county jails, he received information defendant had weapons in the jail and might use them against gang members who had robbed him. When Nordskog contacted him, defendant admitted he had weapons, and the detective found two shanks defendant had concealed on his person. Defendant told Nordskog he had intended to use the shanks to cut the throats of three gang members.
 

 Detective Pietrantoni testified that in February 1989 sheriff’s deputies found defendant in possession of two more shanks as well as a paper clip flattened at one end and bent in a manner that, Pietrantoni opined from his experience and training, would make the paper clip serve as a key to open handcuffs.
 

 Defense
 

 The defense played a tape of interviews conducted in Estonia with defendant’s parents and three acquaintances. Defendant’s parents said he was a fussy baby, but well-behaved and not aggressive as a child. He had fantasies that he sometimes expressed in drawings. He sometimes walked in his sleep.
 
 *615
 
 When he was 15, he and a friend got into trouble for taking food from a bread factory. Defendant had only a few friends but was easily influenced by them. He was easily upset but not aggressive. In secondary school he was thought intelligent but worked below his capacity. He went into the army at age 19, where he was beaten (as was common with new recruits) and suffered a skin outbreak.
 

 A work supervisor stated defendant was sometimes very irritable, getting into conflicts with coworkers for no apparent reason. He exaggerated and talked in a fantastic manner about places he claimed to have visited. A school official said that as a teenager defendant was something of a loner and seemed distracted and depressed. A friend, who went into the army before defendant, said that Estonians were sometimes particularly persecuted (e.g., were called fascists and had their language referred to as German), although all recruits suffered some taunting and bullying. He remembered that defendant sometimes had laughable fantasies, but could not give examples. Defendant sometimes got angry but hid his emotions.
 

 Dr. Jean Carlin, a psychiatrist, interviewed defendant on three occasions and reviewed materials provided by defense counsel, including police reports and tapes of defendant’s confession and the Estonian interviews. She summarized her conclusions as follows: “[Defendant] suffered from a major mental disorder of thought and behavior as well as mood. He had some paranoid thinking, which means that he is more than average suspicious of other people’s motives, and he had some delusions about things that are going on in the world immediately around him and other parts of the world that he had experienced. Because he had both thought and mood and some behavior problems in the diagnosis, my diagnosis was schizo-affective disorder. What that means is . . .he meets the criteria for thought disorder, i.e., schizophrenia, but his mood or his feeling state is not typical of schizophrenia. His feeling state is more typical of what we used to call manic depressive disorder, now known as bipolar disorder . . . .”
 

 According to Dr. Carlin, jail medical records showed defendant had received the same or a similar diagnosis from jail physicians, and was prescribed antipsychotic and antidepression medication. After Dr. Carlin interviewed defendant a second time, she concluded his mental state was deteriorating and he was incapable of standing trial. By judicial notice, the jury was informed that defendant had in fact been found incompetent to stand trial in May 1990, was treated at Atascadero State Hospital and was then, in March 1991, found to have regained his competency.
 

 Dr. Carlin opined that defendant suffered from the diagnosed mental disorders at the time of the killing and, as a result, had “limited ability
 
 *616
 
 to premeditate” the murder. During one interview, defendant told Carlin that at the time of the attack he thought Viivi Piirisild was actually the character “Jason” from the Friday the 13th horror movies. When asked what he saw when Viivi came home, defendant responded, “Jason was after me, of course, because I was on Crystal Lake, and he, Jason, was from Crystal Lake. He kills people.” On cross-examination, however, Dr. Carlin agreed that defendant’s detailed and fact-consistent confession to police, a few weeks after the killing, tended to show he was not delusional during the crime.
 

 Finally, at defense request the parties stipulated that three managers on jobs defendant held in 1987 and 1988 would, if called, testify he was a good employee, got along with others and had a good attitude.
 

 Rebuttal
 

 Sheriff’s Deputy Vincent Pirozzi was responsible for transporting defendant to and from the courtroom during trial. One day during the guilt phase, defendant told Pirozzi that whenever he tried to feel bad about killing Viivi Piirisild, he remembered the unfair way she had treated Waidla and got angry instead. On another occasion defendant said he and Waidla had not believed Avo was really going out of town, and they had intended to kill both the Piirisilds. Later he said he was still angry at Avo for failing to give Waidla what he owed him, and that Avo would “get what’s coming to him.”
 

 Discussion
 

 Guilt Phase Issues
 

 I.
 
 Burden of Proof as to Restoration of Competency
 

 On May 9, 1990, the trial court found, pursuant to section 1368, that defendant was incompetent to stand trial because he was unable rationally to assist his attorney in the conduct of his defense. Defendant had reported auditory hallucinations and demonstrated paranoid thinking about his case, counsel, and court personnel. Criminal proceedings were suspended and defendant placed in the state hospital for treatment.
 

 On February 4, 1991, the trial court announced it had received a certificate of restoration of competency (§ 1372, subd. (a)(1)) from the Department of Mental Health. According to a report accompanying the certificate of restoration, the hospital’s treatment team had evaluated defendant as “an unsophisticated sociopath with no major mental illness,” and recommended he be
 
 *617
 
 returned to court “as trial competent on psychotropic medications.” Another report found defendant “presents as restored to trial competency” and “could choose to cooperate rationally with counsel or might choose to act out in court.” At defense request, defendant was reexamined by three additional experts.
 

 On May 31, 1991, defense counsel stated he wished to “submit on the doctors’ letters the question of [defendant’s] competency to go to trial.” The prosecutor did the same. The trial court then ruled as follows: “In light of that, the court adopts the findings of the Department of Mental Health, and finds that in fact the defendant has regained his present competency to stand trial.”
 

 Section 1369 sets out the procedures applicable in a “trial by court or jury of the question of mental competence.” Subdivision (f) of the statute provides, among other things, that competence is presumed “unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent.” Section 1372 sets out procedures to be followed upon restoration of competence. Although the statute does not expressly provide for a trial or hearing on competence if the question of restoration is contested, it does at one point refer to such a hearing, requiring that certain mental health officials be given notice “of the date of any hearing on the defendant’s competence and whether or not the defendant was found by the court to have recovered competence.” (§ 1372, subd. (c).)
 

 In
 
 People
 
 v.
 
 Mixon
 
 (1990) 225 Cal.App.3d 1471, 1478-1485 [275 Cal.Rptr. 817]
 
 (Mixon),
 
 the Court of Appeal held that a defendant certified as competent and returned to court is entitled to a hearing on the issue if it is contested and that, in such a hearing, the presumption of competencé and corresponding allocation of the burden of proof on competence, set out in section 1369, subdivision (f), applies. This court has neither approved nor disapproved Mixon's holding. Defendant contends that
 
 Mixon
 
 was wrong in applying the presumption of competence to a restoration hearing, that the trial court must be assumed to have followed
 
 Mixon
 
 as the only outstanding authority on this point, and that the assumed error is reversible per se.
 

 We need not decide in this case whether
 
 Mixon
 
 properly applied a presumption of competence in a hearing on restoration of competence, because nothing in the record suggests the trial court applied any presumption at all in adopting the findings of the Department of Mental Health. The report from that department was unequivocal in finding defendant competent as medicated. Despite having obtained additional expert examinations, defense counsel presented no evidence or argument to controvert those findings. On such a factual record we will not assume the trial court’s decision
 
 *618
 
 was dependent on any presumption affecting the burden of proof, whether correct or erroneous, for when evidence is both sufficient to establish a point and completely uncontroverted, questions regarding the effect of allocating the burden of proof simply do not arise. (See
 
 Medina v. California
 
 (1992) 505 U.S. 437, 449 [112 S.Ct. 2572, 2579, 120 L.Ed.2d 353] [“Under California law, the allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise . . . .”].) In other words, a theoretically erroneous allocation of the burden could not, in these circumstances, be prejudicial, as under either allocation the court could not do anything but find the substantial and uncontested evidence of competency predominated.
 
 [2]
 

 II.
 
 Constitutionality of Allocating Burden of Proof on Competency to Defendant
 

 In a related argument, defendant contends that by placing the burden on him of proving incompetence at a restoration hearing, pursuant to
 
 Mixon,
 
 the trial court deprived him of due process of law in violation of the Fourteenth Amendment to the United States Constitution. Although both this court and the United States Supreme Court have held the presumption of competence as applied in an initial hearing under section 1369 does not violate due process rights
 
 (Medina v. California, supra,
 
 505 U.S. at pp. 446-453 [112 S.Ct. at pp. 2577-2582];
 
 People
 
 v.
 
 Medina
 
 (1990) 51 Cal.3d 870, 881-885 [274 Cal.Rptr. 849, 799 P.2d 1282]), defendant, relying on a more recent high court decision
 
 (Cooper v. Oklahoma
 
 (1996) 517 U.S. 348 [116 S.Ct. 1373, 134 L.Ed.2d 498] [state may not require that defendant prove incompetence by clear and convincing evidence]), argues due process required a different burden allocation once he had been found incompetent.
 

 As just discussed, nothing in the record indicates the trial court actually employed Mixon’s presumption of competence in finding competence restored, and in these circumstances the asserted misallocation of the burden of proof could not have been prejudicial under any standard of prejudice. This case therefore provides no occasion to address the constitutional issue.
 

 III.
 
 Sufficiency of Evidence to Prove Robbery
 

 Defendant contends the evidence was insufficient to prove robbery, first degree murder on a robbery-murder theory, or the special circumstance
 
 *619
 
 of murder in the commission of robbery. The “pivotal question” he poses is whether there was substantial evidence to show that the “ ‘requisite intent to steal arose either before or during the commission of the act of force.’
 
 (People v. Marshall
 
 [(1997)] 15 Cal.4th [1,] 34 [61 Cal.Rptr.2d 84, 931 P.2d 262].)” Relying also on
 
 People
 
 v.
 
 Morris
 
 (1988) 46 Cal.3d 1 [249 Cal.Rptr. 119, 756 P.2d 843], overruled on other grounds in
 
 In re Sassounian
 
 (1995) 9 Cal.4th 535, 543-544, fn. 5 [37 Cal.Rptr.2d 446, 887 P.2d 527], defendant argues the evidence he took personal property (credit and telephone calling cards) from Viivi’s person is insufficient to show the fatal assault was committed with the intent to steal.
 

 Unlike
 
 People v. Marshall, supra,
 
 where the only property taken from the victim was a letter of no clear value to the defendant (15 Cal.4th at pp. 34-35), and
 
 People
 
 v.
 
 Morris, supra,
 
 where no evidence was presented of a preexisting intent to steal and the circumstances were as consistent with a taking by stealth or a consensual payment as with a taking by force (46 Cal.3d at pp. 20-21), here there was ample evidence that defendant and Waidla planned before the killing to steal from the Piirisilds, did steal from the Piirisilds before the killing, and then took additional property by force when Viivi arrived home. In urgent need of money, defendant and Waidla stole a radio telephone from the Piirisilds’ Crestline cabin, pawning it in Van Nuys on July 11. While at the cabin they decided to frighten Viivi into giving them the pink slip for the car, which they could then sell for money. On July 12, on the way to the North Hollywood house, they were planning, according to defendant’s taped statement, to “get some money for food.” When they broke into the house they “were going to take something from the house and get away.” Before Viivi came home they did, in fact, take some of her jewelry, which they sold to a pawnshop later that day. When Viivi arrived home from the dentist, Waidla, later joined by defendant, attacked and killed her, and took her credit and telephone cards, which she kept in her purse. From this and the entirety of other evidence presented, a rational juror could find it proven beyond a reasonable doubt that defendant attacked Viivi with the intent of taking property from her person or immediate presence, and did take such property. (See
 
 People
 
 v.
 
 Millwee
 
 (1998) 18 Cal.4th 96, 132 [74 Cal.Rptr.2d 418, 954 P.2d 990];
 
 People
 
 v.
 
 Johnson
 
 (1980) 26 Cal.3d 557, 578-579 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)
 

 Again citing
 
 People
 
 v.
 
 Morris,
 
 defendant also contends the evidence was insufficient to establish the robbery-murder special circumstance because it did not show the murder was committed during the commission of a robbery, i.e., that the robbery was not merely incidental to the killing.
 
 (People
 
 v.
 
 Moris, supra,
 
 46 Cal.3d at p. 21; see
 
 People
 
 v.
 
 Marshall, supra,
 
 15 Cal.4th at pp. 40-41 [current § 190.2, subd. (a)(17), which requires the murder be
 
 *620
 
 committed “while the defendant was engaged in” the felony, is not satisfied where robbery is merely incidental to murder].) Again, we disagree. The present record, unlike that in
 
 People v. Morris,
 
 contains substantial evidence of a preexisting intent to steal items of value, from which a rational juror could find beyond a reasonable doubt the robbery was not merely incidental to the murder.
 

 IV.
 
 Failure to Instruct on Theft as a Lesser Included Offense of Robbery
 

 Defendant contends that, even if the evidence was sufficient to prove robbery, it did not compel that finding, and a reasonable jury could have believed that defendant’s intent to take property from the victim’s person arose only after the killing. Because such a taking would amount only to theft, a lesser offense included in robbery, defendant contends the trial court was obliged to instruct, sua sponte, on the lesser offense.
 
 (People
 
 v.
 
 Turner
 
 (1990) 50 Cal.3d 668, 690 [268 Cal.Rptr. 706, 789 P.2d 887];
 
 People
 
 v.
 
 Ramkeesoon
 
 (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613].)
 

 We reject the claim that the evidence of after-formed intent rises to the level of substantial evidence justifying an instruction on theft. From portions of defendant’s statement to police, the jury could certainly infer that defendant and Waidla harbored motives to kill Viivi independent of theft—to wit, anger and vengeance—and that they acted in part from those independent motives. But nothing in the statement, or in their actions, suggests they at any point abandoned the intent to steal from the Piirisilds as well. To the contrary, the evidence shows defendant and Waidla took food and jewelry immediately upon breaking into the Piirisilds’ house. Defendant himself stated that “even until the last moment we didn’t know that we were going to kill her. We just tried to get some money for food . . . .’’He also expressed agreement, it is true, with Detective Pietrantoni’s statement that after taking the jewelry they “decided the heck with just taking the stuff, we are gonna wait for Viivi to get home,” but even that narration does not imply defendant and Waidla abandoned the intent to steal. And, of course, the evidence is uncontroverted that they did in fact take valuables from Viivi by violent means. In effect, defendant’s position requires the jury to have speculated that he and Waidla harbored the intent to steal when they entered, lost it when they decided to wait for Viivi, and regained it immediately after killing her. Although such a course of thought is possible, there was no direct or circumstantial evidence of it here. “Speculation is an insufficient basis upon which to require the trial court to give an instruction on a lesser included offense.”
 
 (People
 
 v.
 
 Wilson
 
 (1992) 3 Cal.4th 926, 942 [13 Cal.Rptr.2d 259, 838 P.2d 1212].)
 

 
 *621
 
 Even, however, if the trial court erred in not instructing on theft, the error was harmless. Under the state law standard of prejudice, defendant must show a reasonable probability that the lack of a theft instruction affected the outcome.
 
 (People v. Breverman
 
 (1998) 19 Cal.4th 142, 165 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) He cannot do so, for, as we have just seen, evidence that the taking of property from Viivi was theft rather than robbery was, at best, extremely weak compared to the evidence Viivi’s killing was accompanied by an intent to steal. Similarly, even assuming the failure to instruct on this lesser offense violated federal constitutional rights,
 
 [3]
 
 we would find the error harmless beyond a reasonable doubt.
 
 (Chapman
 
 v.
 
 California
 
 (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065].)
 

 Defendant posits the factual theory that Viivi’s murder was motivated by personal anger and, as defendant’s reply brief puts it, the taking was merely “incidental to the killing.” Evidence supporting that theory was, as already discussed, slight or nonexistent. The jury, moreover, necessarily rejected that factual theory in finding true the robbery-murder special circumstance, which they were instructed was not established if “the robbery was merely incidental to the commission of the murder.” Thus, the question whether Viivi was killed with the intent to take property from her, or whether the taking was merely an afterthought to the killing, was clearly presented to, and resolved by, the jury. (See
 
 People
 
 v.
 
 Turner, supra,
 
 50 Cal.3d at p. 691.) The special circumstance finding, in addition, shows the conviction of robbery was not the result of giving the jury an “all or nothing” choice between robbery and acquittal; even if we assume the jury might have convicted defendant of robbery despite believing the element of taking by force was not proven, we cannot assume the jury, unconvinced a robbery had occurred, would have gone on to find true a capital murder allegation simply because it was not given the option of convicting defendant of theft. (See
 
 id.
 
 at p. 693.)
 

 V.
 
 Failure to Instruct on Assault and Trespass as Lesser Included Offenses of the Charged Robbery and Burglary
 

 Defendant contends the trial court was obliged, sua sponte, to instruct the jury on assault as a lesser offense included in the charge of
 
 *622
 
 robbery and on trespass as a lesser offense included in the charge of burglary.
 
 [4]
 
 The jury, he argues, could reasonably have found he lacked the intent to steal necessary for robbery and (as charged here) burglary, in that he and Waidla intended only to take property, the Triumph Spitfire sports car, to which Waidla had a good faith claim of right. (See
 
 People
 
 v.
 
 Butler
 
 (1967) 65 Cal.2d 569, 571-573 [55 Cal.Rptr. 511, 421 P.2d 703].)
 

 We recently overruled
 
 People
 
 v.
 
 Butler
 
 to the extent it allowed a claim-of-right defense to robbery where the alleged robber’s intent was to collect a claimed debt, rather than to recover specific property taken from him.
 
 (People
 
 v.
 
 Tufunga
 
 (1999) 21 Cal.4th 935, 956 [90 Cal.Rptr.2d 143, 987 P.2d 168].) Application of that holding to conduct preceding Tufunga’s finality, however, would constitute an unforeseeable retroactive expansion of criminal liability,' in violation of due process.
 
 (Bouie v. City of Columbia
 
 (1964) 378 U.S. 347, 353 [84 S.Ct. 1697, 1702, 12 L.Ed.2d 894].)
 

 We conclude, nonetheless, that the claim-of-right defense was unavailable on these facts. The record discloses no substantial evidence that defendant’s intent, on entering the house or attacking the victim, was limited to taking the sports car, its title slip, or even property of equivalent value. Although defendant told police he and Waidla, while at Crestline, discussed scaring Viivi into giving them the car, on the way to the North Hollywood house, he said, they were planning simply “to get some money for food.” When they got to the house, rather than carry out any plan of confronting her and obtaining the car, they waited until she left before breaking in. Defendant said their intent on entering was “to take something from the house and get away,” though later they decided to wait for Viivi to return. When she did return, they made no effort to force her into giving them the car or title slip, instead attacking her as soon as she came in, with overwhelming deadly force. The items they took, Viivi’s jewelry and the credit and telephone
 
 *623
 
 cards, bore no particular relationship in nature or value to the car to which they believed Waidla was entitled. The evidence shows only a generalized intent to steal from the Piirisilds, a felonious intent that is not negated by even a good faith belief Waidla was owed a particular automobile. (See
 
 People
 
 v.
 
 Barnett
 
 (1998) 17 Cal.4th 1044, 1145 [74 Cal.Rptr.2d 121, 954 P.2d 384] [claim-of-right defense not available where defendant “simply seized whatever items of value” he could get from robbery victims];
 
 People v. Alvarado
 
 (1982) 133 Cal.App.3d 1003, 1022 [184 Cal.Rptr. 483] [no instruction on defense required where defendants “conducted a general ransacking of the bedroom indiscriminately taking items of value never specifically related to any claim of right”].) The trial court did not err in failing to give instructions on trespass and assault, even if those offenses were included within the charges of burglary and robbery.
 

 VI.
 
 Erroneous Answer to Jury’s Question Regarding Duration of Burglary
 

 Defendant contends the trial court, by its answer to a question the jury posed during deliberations, erroneously removed a factual issue from the jury’s consideration, in violation of state and federal due process and jury trial principles requiring all elements of the charged offenses to be proven to the jury beyond a reasonable doubt. (See
 
 United States v. Gaudin
 
 (1995) 515 U.S. 506, 510 [115 S.Ct. 2310, 2313-2314, 132 L.Ed.2d 444];
 
 Sullivan v. Louisiana
 
 (1993) 508 U.S. 275, 277-278 [113 S.Ct. 2078, 2080-2081, 124 L.Ed.2d 182];
 
 People
 
 v.
 
 Flood
 
 (1998) 18 Cal.4th 470, 479-482 [76 Cal.Rptr.2d 180, 957 P.2d 869].) We agree, but conclude the error was harmless as to both the conviction of first degree murder and the burglary-murder special circumstance.
 

 During guilt phase deliberations, the jury sent out a note with the following two related questions: “Does burglary begin when a structure is entered and continue until the structure is left? If during the process of a burglary, a robbery begins, does the crime of burglary continue until the structure is left?” Over defense objection, the court answered as follows: “Although it is alleged that the killing in the present case occurred sometime after it is alleged the defendant entered the house, if the jury finds that the defendant committed burglary by entering the house with the intent to steal, the homicide and the burglary are parts of one continuous transaction.”
 

 The court drew its answer from language in
 
 People
 
 v.
 
 Mason
 
 (1960) 54 Cal.2d 164, 169 [4 Cal.Rptr. 841, 351 P.2d 1025]. In that case, the evidence showed the defendant had entered the house of a woman whom he had previously harassed and threatened, remaining there for almost a full day
 
 *624
 
 before she came home with her mother and son. The defendant then emerged from a closet and shot at the woman, injuring her and killing her mother.
 
 (Id.
 
 at pp. 165-167.) On appeal from his murder conviction, Mason contended the jury should not have been instructed on a felony-murder theory of first degree murder because of the long period between the entry and the killing. We rejected that contention, observing that our law of felony murder does not require a “ ‘strict causal relationship’ ” between the felony and the murder, that it requires no “ ‘technical inquiry concerning whether there has been a completion, abandonment, or desistence of the felony before the homicide was completed,’ ” and that the homicide is considered to be committed in the perpetration of the felony if the two were parts of “ ‘one continuous transaction.’ ”
 
 (Id.
 
 at pp. 168-169.)
 

 In the passage the trial court here adapted for its answer to the jury question, we continued: “Although the killing in the present case occurred about 20 hours after defendant entered the house, if the jury found that defendant committed burglary by entering the house with the intent to commit a felonious assault, the homicide and the burglary were parts of one continuous transaction. [Citations.] Accordingly, the trial court did not err in instructing the jury that murder committed in the perpetration of burglary is murder of the first degree.”
 
 (People
 
 v.
 
 Mason, supra,
 
 54 Cal.2d at p. 169.)
 

 We have repeatedly, both before and after
 
 People v. Mason,
 
 invoked the “one continuous transaction” analysis as a standard for
 
 sufficiency of evidence
 
 to support a felony-murder instruction or conviction. (See, e.g.,
 
 People v. Welch
 
 (1972) 8 Cal.3d 106, 118-119 [104 Cal.Rptr. 217, 501 P.2d 225];
 
 People v. Chavez
 
 (1951) 37 Cal.2d 656, 669-670 [234 P.2d 632]; see also
 
 People v. Hernandez
 
 (1988) 47 Cal.3d 315, 348 [253 Cal.Rptr. 199, 763 P.2d 1289] [rejecting “strict construction of the temporal relationship” between felony and killing as to both first degree murder and felony-murder special circumstance].) But to hold, as we did in these cases and in
 
 People
 
 v.
 
 Mason,
 
 that evidence sufficient to show a single continuous transaction justifies an instruction or conviction on felony murder, is not to hold that the judge, rather than the jury, decides whether the existence of such a single transaction and, hence, a murder in the perpetration of the felony, was proven beyond a reasonable doubt. Even where substantial evidence supports such a finding, it is for the jury to decide whether or not the murder was committed “in the perpetration of” (§ 189), or “while the defendant was engaged in . . . the commission of’ (§ 190.2, subd. (a)(17)), the specified felony. By its answer to the jury’s question, the trial court in this case effectively removed that factual issue from the jury’s consideration.
 

 This was error of constitutional dimension, as the court thereby relieved the jury of its obligation to determine whether all the elements of first degree
 
 *625
 
 murder and the burglary-murder special circumstance were proven beyond a reasonable doubt. Omission or removal of a single element from the jury is not, however, “a structural defect in the trial mechanism that defies harmless error review and automatically requires reversal. . . .”
 
 (People
 
 v.
 
 Flood, supra,
 
 18 Cal.4th at p. 503; see also
 
 Neder v. United States
 
 (1999) 527 U.S. 1, 8-15 [119 S.Ct. 1827, 1833-1837, 144 L.Ed.2d 35, 46-51];
 
 People
 
 v.
 
 Marshall
 
 (1996) 13 Cal.4th 799, 851-852 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) We may affirm the jury’s verdicts despite the error if, but only if, it appears beyond a reasonable doubt that the error did not contribute to the particular verdict at issue.
 
 (People
 
 v.
 
 Flood, supra,
 
 at p. 504;
 
 Chapman
 
 v.
 
 California, supra,
 
 386 U.S. at p. 24 [87 S.Ct. at p. 828].) In particular, we may affirm despite the error if the jury that rendered the verdict at issue could not rationally have found the omitted element unproven; the error is harmless, that is, if the record contains no substantial evidence supporting a factual theory under which the elements submitted to the jury were proven but the omitted element was not.
 
 (Neder
 
 v.
 
 United States, supra,
 
 527 U.S. at pp. 18-20 [119 S.Ct. at pp. 1838-1839, 144 L.Ed.2d at p. 53].)
 

 That the erroneous answer did not contribute to defendant’s conviction of first degree murder is plain. In addition to the theory of killing in the perpetration of burglary, the jury was instructed on three additional theories of first degree murder: killing in the perpetration of robbery, deliberate and premeditated murder, and murder by lying in wait. As the jury found true the robbery-murder special-circumstance allegation, necessarily finding the murder was committed in the commission of robbery, “we can determine that [the first degree murder] verdict rested on at least one correct theory,” and the court’s answer on duration of burglary was thus “of no consequence to the murder charge.”
 
 (People
 
 v.
 
 Kelly
 
 (1992) 1 Cal.4th 495, 531 [3 Cal.Rptr.2d 677, 822 P.2d 385], italics omitted.)
 

 The error’s harmlessness as to the burglary-murder special-circumstance finding is also clear. Under some circumstances, perhaps, the burglarious “transaction” that begins with entry into the building might be found to have ended even though the burglar has not left—if, for example, he abandons his original larcenous intent but resolves to stay for a nonfelonious purpose. The evidence before the jury here, however, did not include any such abandonment of intent or any similar interruption. Although there was evidence that after entering and stealing, defendant and his coperpetrator formed the
 
 additional
 
 intent to attack the victim, there was no substantial evidence they at any point before the killing discarded or abandoned their intent to steal from her. (See pt. IV,
 
 ante,
 
 at pp. 620-621.) Nor was there evidence of any other arguably significant interruption of events between the entry and the
 
 *626
 
 homicide; the evidence was simply that after gathering some personal property, the burglars waited for Viivi to come home, then assaulted and killed her as she entered the house. The erroneous instruction was harmless, therefore, under the standard articulated in
 
 Neder
 
 v.
 
 United States, supra,
 
 527 U.S. at pages 18-20 [119 S.Ct. at pages 1838-1839, 144 L.Ed.2d at page 53]: on this record, no rational jury could find that burglary was committed but fail to find that the burglary and homicide were parts of a single continuous transaction.
 

 In this case, to be sure, the erroneous instruction was given in response to an inquiry from the deliberating jury, an inquiry suggesting that one or more jurors were in doubt whether the murder of Viivi Piirisild was committed while defendant was engaged in the commission of burglary. The jurors’ concern, however, was apparently not with the factual issue of whether the burglary and homicide were parts of a single continuous transaction—an issue on which they had not yet been instructed—but rather with possible legal standards for duration of burglary. There is thus no reason to doubt the jury would have reached the same verdict had the trial court correctly instructed that the jurors must themselves decide whether the homicide and burglary were part of a single continuous transaction.
 

 VII.
 
 Refusal to Instruct on Second Degree Murder
 

 Defendant requested that the jury be instructed on second degree murder, although defense counsel was unable to cite any evidence supporting the view the killing was not deliberate and premeditated. The trial court, seeing no evidence upon which a second degree murder verdict could reasonably rest, refused the instruction. Defendant contends the refusal was error. He argues the jury could reasonably have found that the killing was not first degree felony murder because the charged felonies were not committed and that it was not premeditated because, according to defendant’s taped statement to police, “even until the last moment we didn’t know that we were going to kill her.”
 

 In part IV,
 
 ante,
 
 we rejected defendant’s contention that the evidence would have allowed a reasonable trier of fact to find defendant did not commit robbery in the forcible taking of Viivi Piirisild’s property because his intent to steal was formed only after the attack. Assuming, however, that a reasonable jury
 
 could,
 
 on this evidence, have acquitted on both burglary and robbery because of after-formed intent, such a jury could not
 
 also
 
 have reasonably acquitted of premeditated and deliberate first degree murder. If defendant did not form the intent to steal until after breaking into the house and attacking the victim, the only motive for the entry and attack suggested
 
 *627
 
 by the evidence was to kill the victim. Since the entry and attack were indisputably planned in advance—defendant and Waidla brought tools for the burglary, discussed in advance the desirability of killing Viivi, armed themselves with a knife and hatchet, and waited about 45 minutes for Viivi to come home before attacking her—a rational jury could only conclude the murder was, if not committed as part of a robbery or burglary, necessarily premeditated. In short, the evidence was consistent with a theory of premeditated and deliberate first degree murder, with a theory of first degree felony murder, or with a theory of both, but not with a theory of neither. No substantial evidence having been presented to support such a verdict, the trial court did not err in refusing to instruct on second degree murder.
 
 (People v. Wilson, supra,
 
 3 Cal.4th at pp. 940-941.) Nor did the federal Constitution require an instruction on second degree murder. (See
 
 ante,
 
 p. 621, fn. 3.)
 

 VIII.
 
 Failure to Instruct on Target Offenses for Natural and Probable Consequences Rule
 

 With the agreement of both parties, the court instructed the jury that defendant could be guilty of the offenses charged in counts 1 through 6 if he intentionally aided and abetted another crime that had the charged crime as its natural and probable consequence. Defendant contends the court erred in failing also to instruct, sua sponte, on the definitions of the possible “target” crimes that the jury could have thought led to the charged murder, burglary and robbery.
 

 In
 
 People v. Prettyman
 
 (1996) 14 Cal.4th 248 [58 Cal.Rptr.2d 827, 926 P.2d 1013], we held that instructions on the “natural and probable consequences” rule are required only when the prosecution has elected to rely on that theory of accomplice liability, and then, only when substantial evidence supports the theory. When the instruction is given, however, it should identify and define any target offenses allegedly aided and abetted by the defendant.
 
 (Id.
 
 at pp. 268-269.)
 

 In the present case, whether the prosecutor requested that the instruction on the natural and probable consequences rule (CALJIC No. 3.02) be given is unclear: although the copy of the written instruction in the clerk’s transcript is marked “Requested by People,” the reporter’s transcript shows that the court itself proposed giving the instruction, and both parties agreed. Certainly the prosecutor did not “rely” on the rule as a theory of liability; it went unmentioned in his argument, which focused on evidence of defendant’s
 
 direct
 
 perpetration of the charged offenses, rather than on any theory of accomplice liability.
 

 
 *628
 
 Assuming it was error under these circumstances to instruct the jury with CALJIC No. 3.02 without identifying or defining any target offenses, and that defendant has not waived the error by failing to object to the instruction given, the error was clearly harmless. As in
 
 People
 
 v.
 
 Prettyman, supra,
 
 14 Cal.4th at page 273, “[bjecause the parties made no reference to the ‘natural and probable consequences’ doctrine in their arguments to the jury, it is highly unlikely that the jury relied on that rule when it convicted defendant” of any of the charged offenses.
 
 [5]
 
 As to the charges of murder, robbery and burglary (of the North Hollywood home), the jury specifically found defendant personally used two deadly weapons (a knife and a bludgeon) in the commission of these offenses, a finding inconsistent with any supposition that the jury might have relied on a theory of accomplice liability. There is, therefore, no reasonable likelihood the jury misapplied the court’s instruction on the natural and probable consequences rule
 
 (People v. Prettyman, supra,
 
 at p. 272) and no reasonable probability any of the jury’s verdicts were affected by the instruction
 
 (id.
 
 at p. 274).
 

 IX.
 
 Admission of the Victim’s Hearsay Statement Regarding Fear of Defendant
 

 As earlier outlined, FBI Special Agent George Charon testified Viivi Piirisild told him, on July 8, that defendant and Waidla had called her and asked to come to the house on the pretext of retrieving items Waidla had forgotten, that she knew there were no such items and had refused the request, that she was concerned or frightened by the call because defendant and Waidla knew her husband was out of town, and that she would call 911 if they came to her house.
 

 At trial, defendant objected to this testimony, presented in an offer of proof, as inadmissible hearsay. The court overruled the objection, finding Charon’s testimony within the hearsay exception for evidence of a statement of the declarant’s then existing state of mind when that state of mind is itself an issue in the action. (Evid. Code, § 1250, subd. (a)(1).)
 
 [6]
 
 The evidence was admissible under this exception, the court explained, to show that Viivi
 
 *629
 
 Piirisild, in fear of defendant and Waidla, would not voluntarily have given them any of her personal property and that, therefore, “the only way that Mr. Waidla and Mr. Sakarias could have achieved—obtained this property would have been by foul means, through robbery or other violent means.” The court also weighed the prejudicial effect of the evidence against its probative value, finding the latter outweighed the former for purposes of Evidence Code section 352. After Charon testified, the court admonished the jury his testimony as to the victim’s statements could be considered only to show her state of mind at the time the statements were made.
 

 Defendant contends Viivi’s fear of defendant and Waidla was not truly an issue at trial because defense counsel offered to stipulate that Viivi did not make a gift of personal property to defendant and Waidla. Because the hearsay was therefore not within Evidence Code section 1250 or any other exception, he further argues, its admission violated his Sixth Amendment right to confront the witnesses against him.
 

 In the course of the court and counsel’s discussion of defendant’s objection, defense counsel stated: “Well, I’m willing to stipulate that he got them by surreptitious means. It hardly seems credible that he would be given to
 
 [sic]
 
 them as [a] gift under the circumstances.” We agree with the Attorney General that this offer did not eliminate the victim’s state of mind as an issue at trial. As defense counsel’s own remarks suggest, the circumstances of the relationship between Viivi Piirisild and defendant in the period leading up to the killing were relevant to show that defendant and Waidla took personal property from Viivi by force, committing robbery and robbery murder. It was the People’s burden to prove those offenses, which the prosecutor did through circumstantial evidence provided by a number of witnesses, including, besides Special Agent Charon, Avo Piirisild and Rita Hughes, and through defendant’s statements to police, as well as through direct evidence contained in those statements. The trial court was not obliged to force the prosecutor to accept a partial stipulation on this point instead of proving it by an accumulation of circumstantial and direct evidence. At least where the defense proposal does not constitute an offer to admit completely an element of a charged crime (see
 
 People
 
 v.
 
 Bonin
 
 (1989) 47 Cal.3d 808, 849 [254 Cal.Rptr. 298, 765 P.2d 460]), the “ ‘general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state’s case of its persuasiveness and forcefulness.’”
 
 (People v. Arias
 
 (1996) 13 Cal.4th 92, 131 [51 Cal.Rptr.2d 770, 913 P.2d 980];
 
 People v. Garceau
 
 (1993) 6 Cal.4th 140, 182 [24 Cal.Rptr.2d 664, 862 P.2d 664];
 
 People v. Edelbacher
 
 (1989) 47 Cal.3d 983, 1007 [254 Cal.Rptr. 586, 766 P.2d 1].)
 

 
 *630
 
 Any error in admitting Special Agent Charon’s testimony was, in addition, harmless. Avo Piirisild testified that Viivi had received a seemingly threatening postcard from defendant and Waidla and that when, on July 4, they came to the Piirisilds’ house, Viivi was so scared of them she urged Avo not to answer the door. Rita Hughes testified that on July 11, the day before her death, Viivi told Rita not to come stay with her because it was not safe. Given this additional evidence of Viivi’s state of mind, the fact that Charon’s testimony included no prejudicial evidence of threats or violent acts committed by defendant and Waidla, and the court’s admonition limiting the jury’s consideration of Charon’s testimony to the state-of-mind question, we see no reasonable probability
 
 (People
 
 v.
 
 Watson
 
 (1956) 46 Cal.2d 818, 836 [299 P.2d 243]) that Charon’s testimony affected the verdicts.
 

 Defendant argues Charon’s testimony may have been prejudicial on the question of intent to kill, a mental state required for the special circumstances if the jury believed defendant only assisted Waidla in the killing.
 
 (People
 
 v.
 
 Anderson
 
 (1987) 43 Cal.3d 1104, 1139 [240 Cal.Rptr. 585, 742 P.2d 1306].) Defendant’s intent to kill, however, was not only shown by overwhelming and undisputed evidence, but was expressly conceded by his attorney in argument to the jury.
 
 [7]
 
 Even assuming, then, that admission of Charon’s testimony was federal constitutional error, and that defendant did not waive the constitutional objection by his failure to cite constitutional authority in the trial court, admission of the evidence was harmless beyond a reasonable doubt
 
 (Chapman v. California, supra,
 
 386 U.S. at p. 24 [87 S.Ct. at p. 828]) on the issue of intent to kill, the only issue on which defendant claims he was prejudiced.
 

 X.
 
 Vicinage as to Counts 4, 5 and 6
 

 Defendant was charged in count 4 of the information with burglarizing the Piirisilds’ Crestline cabin, in count 5 with theft of telephone services for calls made from the cabin, and in count 6 with “concealing, selling, and withholding” stolen property, to wit, a radio telephone taken from the cabin. Because the cabin is located in San Bernardino County, defendant objected to being tried before a jury drawn from Los Angeles County, arguing such a trial violated his Sixth Amendment vicinage right to be tried before a jury drawn from the judicial district where the alleged
 
 *631
 
 crime was committed. The trial court ruled both venue and vicinage were properly in Los Angeles County under sections 502.7 and 786.
 
 [8]
 

 Defendant is correct that vicinage is a concept distinct from venue, that the cited statutes, on their face, establish only venue, and that trial in a statutorily proper venue with a jury drawn from that jurisdiction, might, under some circumstances, violate a defendant’s constitutional vicinage rights. (See
 
 Hernandez
 
 v.
 
 Municipal Court
 
 (1989) 49 Cal.3d 713, 716, fn. 1 [263 Cal.Rptr. 513, 781 P.2d 547].) We conclude, however, that in the present case the same facts malting venue proper in Los Angeles County also established the charged crimes were committed in that county for vicinage purposes.
 

 By bringing the radio telephone into Los Angeles County, as alleged in count 6 of the information, defendant clearly violated section 496 in Los Angeles County by “concealing,” “selling” or “withholding” the property in that county. By malting telephone calls without authorization of the subscriber, Avo Piirisild, whose bill was sent to him for payment at his Los Angeles County residence, as charged in count 5, defendant stole services in both San Bernardino and Los Angeles Counties. Finally, by bringing property taken in the burglary into Los Angeles County, as charged in count 4, defendant extended his commission of that crime into Los Angeles County, at least under the broad concept of commission courts have applied for purposes of determining proper vicinage. (See
 
 People v. Martin
 
 (1995) 38 Cal.App.4th 883, 888-889 [45 Cal.Rptr.2d 502] [where killing was performed in Ventura County, but defendant disposed of body in Santa Barbara County, vicinage as well as venue over murder charge was proper in latter county];
 
 People v. Tamble
 
 (1992) 5 Cal.App.4th 815, 820 [7 Cal.Rptr.2d 446] [burglary of motor home located in San Luis Obispo County may be tried in Santa Barbara County, without obtaining waiver of vicinage rights, because burglars brought loot into that county; provision of § 786 allowing prosecution in jurisdictional district into which stolen property is carried “provides, in the broad sense, for prosecution where the crime was committed”];
 
 People
 
 v.
 
 Campbell
 
 (1991) 230 Cal.App.3d 1432, 1447 [281 Cal.Rptr. 870] [trial under § 786 accords with vicinage requirements because the statute “require[s] at least some act within a county . . . requisite to the offense charged before jurisdiction will attach”];
 
 State v. Howell
 
 (1985) 40 Wn.App. 49 [696 P.2d 1253, 1255] [theft of livestock may be prosecuted in
 
 *632
 
 county into which defendant allegedly took the cattle and tried to sell them: “ ‘[W]here the cause occurs in one county and the result in another,’ ” vicinage is proper in either].) Trial of counts 4, 5 and 6 in Los Angeles County did not violate defendant’s vicinage rights.
 

 Penalty Phase Issues
 

 XI.
 
 Failure of 1978 Death Penalty Law to Adequately Narrow Class of Death-eligible Murderers
 

 Defendant contends the California death penalty statute violates the Eighth Amendment because the special circumstances that determine death eligibility fail to “genuinely narrow” the class of murderers eligible for the death penalty.
 
 (Zant v. Stephens
 
 (1983) 462 U.S. 862, 877 [103 S.Ct. 2733, 2742, 77 L.Ed.2d 235].) We have repeatedly rejected this argument and do so again. (E.g.,
 
 People v. Smithey
 
 (1999) 20 Cal.4th 936, 1017 [86 Cal.Rptr.2d 243, 978 P.2d 1171];
 
 People
 
 v.
 
 Arias, supra,
 
 13 Cal.4th at pp. 186-187;
 
 People v. Crittenden
 
 (1994) 9 Cal.4th 83, 154-156 [36 Cal.Rptr.2d 474, 885 P.2d 887].)'
 

 XII.
 
 Prosecutor’s Use of False and Inconsistent Argument to Obtain Death Penalty
 

 Defendant contends that the prosecutor, who also prosecuted Waidla, argued inconsistent factual theories in the two trials and, in one respect, knowingly made a false argument in defendant’s trial. This conduct, defendant contends, violated his constitutional rights to due process of law. Asking us to take judicial notice of the appellate record of Waidla’s trial, which preceded his own, defendant relies on the prosecutor’s guilt and penalty phase arguments in the two trials to establish the asserted deprivation of due process, which he contends was prejudicial as to the special circumstances and penalty verdicts.
 

 The asserted inconsistencies in prosecutorial theories are as follows. (1) In Waidla’s trial, the prosecutor argued Waidla inflicted the three chopping wounds to the victim’s upper head with the blade edge of the hatchet during the initial attack in the living room (as well as inflicting the blunt force wounds with the back of the hatchet); in defendant’s trial, he presented evidence (defendant’s statements), and argued, that defendant inflicted these three wounds in the bedroom, after the initial attack ended and the victim was dragged to the bedroom. (2) In Waidla’s trial, the prosecutor presented evidence (the medical examiner’s expert opinion), and argued, that the victim was dead when she was dragged into the bedroom; in defendant’s
 
 *633
 
 trial, he presented no such evidence and argued the victim may still have been alive when, in the bedroom, defendant struck her with the blade edge of the hatchet. (3) In Waidla’s trial, the prosecutor argued Waidla was the dominant figure of the two, and planned the burglary and robbery; in defendant’s trial, he argued there was no evidence of domination and that defendant was in all respects an equal partner in the crimes. As to the second-listed inconsistency, defendant also contends the prosecutor’s argument, to the effect the victim may still have been alive when defendant struck her additional blows in the bedroom, was knowingly false.
 

 That a prosecutor’s knowing use of false evidence or argument to obtain a criminal conviction or sentence deprives the defendant of due process is well established. (See, e.g.,
 
 Miller v. Pate
 
 (1967) 386 U.S. 1, 7 [87 S.Ct. 785, 17 L.Ed.2d 690];
 
 Napue
 
 v.
 
 Illinois
 
 (1959) 360 U.S. 264, 269 [79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217];
 
 Brown v. Borg
 
 (9th Cir. 1991) 951 F.2d 1011, 1015;
 
 In re Jackson
 
 (1992) 3 Cal.4th 578, 595-596 [11 Cal.Rptr.2d 531, 835 P.2d 371].) Less clear is whether, knowing falsity aside, a prosecutor oversteps constitutional limits by asserting, in separate trials of different defendants, factually inconsistent or contradictory theories of the criminal events.
 

 The question has most recently been discussed at length by the Ninth Circuit Court of Appeals, sitting en banc, in
 
 Thompson v. Calderon
 
 (9th Cir. 1997) 120 F.3d 1045, reversed on other grounds
 
 sub nom. Calderon
 
 v.
 
 Thompson
 
 (1998) 523 U.S. 538 [118 S.Ct. 1489, 140 L.Ed.2d 728]. In her opinion for the court, Judge Fletcher, writing on this point only for a plurality,
 
 [9]
 
 concluded the death sentence and rape-murder special-circumstance finding returned against Thompson by a California jury required vacation because, inter alia, the prosecutor had subsequently argued, in the trial of coperpetrator David Leitch, that the victim was killed to further Leitch’s personal interests, rather than, as charged and urged against Thompson, in order to prevent her from reporting her rape by Thompson.
 
 (Thompson, supra,
 
 at pp. 1055-1059 (plur. opn. of Fletcher, J.).) Judge Fletcher, reasoning from the principle that the public prosecutor’s legitimate goal is not to obtain convictions as such, but to seek justice, using only tactics that are fundamentally fair and calculated to bring forward the truth, concluded that, under the due process clause, “when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime.”
 
 (Id.
 
 at p. 1058.) Thompson was prejudiced because the position taken in his
 
 *634
 
 trial—that he was alone with the victim and killed her to cover up a rape—was inconsistent with that taken in earlier proceedings and at Leitch’s subsequent trial.
 
 (Id.
 
 at p. 1059.)
 

 In a concurring opinion, Judge Tashima declined to order vacation on this ground because, in his view, a prejudicial due process violation could be established only by finding “which of the two inconsistent theories pursued by the prosecutor represents the true facts and which is false.”
 
 (Thompson
 
 v.
 
 Calderon, supra,
 
 120 F.3d at p. 1064 (conc. opn. of Tashima, J.).) Judge Tashima would have remanded to the district court for an evidentiary hearing on this issue.
 
 (Ibid.)
 

 Dissenting on other grounds, Judge Kozinski agreed with the plurality that prosecutorial inconsistency is troubling, primarily, in his view, because “it raises the suspicion that the prosecutor may have presented testimony he knows, or has reason to believe, is false.”
 
 (Thompson v. Calderon, supra,
 
 120 F.3d at p. 1070 (dis. opn. of Kozinski, J.).) But, he observed, “it is impossible to make judgments about what the prosecutor knew or should have known at our level .... Thus, if the petitioner makes a prima facie case that the prosecutor knowingly presented false evidence, the matter must be resolved at an evidentiary hearing.”
 
 (Id.
 
 at p. 1071 .)
 
 [10]
 

 Finally, Judge Kleinfeld, also dissenting, agreed that “[a] prosecutor cannot present evidence or a case he knows to be false,” but found “no reason to think” the
 
 Thompson
 
 prosecutor, who, Judge Kleinfeld emphasized, had no independent means of discovering why Thompson and Leitch killed the victim, “knew either theory he presented was false, when he presented it or at any time.”
 
 (Thompson
 
 v.
 
 Calderon, supra,
 
 120 F.3d at p. 1074 (dis. opn. of Kleinfeld, J.).)
 

 The
 
 Thompson
 
 opinions are useful because they appear to outline a full range of positions one might take on prosecutorial inconsistency. Judge Fletcher finds a prejudicial due process violation in the inconsistency itself, although even she would apparently permit a change in theory when “new significant evidence comes to light.”
 
 (Thompson v. Calderon, supra,
 
 120 F.3d at p. 1058 (plur. opn. of Fletcher, J.).) Judge Tashima finds a due
 
 *635
 
 process violation in inconsistency, but would rest the prejudice analysis on a determination of which theory is actually true and which false.
 
 (Id.
 
 at p. 1064 (conc. opn. of Tashima, J.).) Judge Kozinski would find a due process violation only when it is shown the prosecutor “presented testimony he knows, or has reason to believe, is false”
 
 (id.
 
 at p. 1070 (dis. opn. of Kozinski, J.)),
 
 [11]
 
 Judge Kleinfeld only if the prosecutor “knows” the evidence is false
 
 (Thompson, supra,
 
 120 F.3d at p. 1074 (dis. opn. of Kleinfeld, J.)).
 

 We need not decide what position on this spectrum we would take, because we conclude that, under any view of the proper constitutional limits, the issue is better decided on a petition for writ of habeas corpus than on direct appeal, at least under the circumstances here presented. Where, as here, the asserted inconsistencies in prosecutorial theory were not the subject of any proceeding in the trial court and, hence, neither the inconsistencies nor any explanations the prosecutor may have been able to offer appear in the appellate record, any due process claim defendant can state should be “presented by petition for writ of habeas corpus rather than by appeal.”
 
 (People v. Sanchez
 
 (1995) 12 Cal.4th 1, 59 [47 Cal.Rptr.2d 843, 906 P.2d 1129], fn. omitted.)
 

 The transcripts of Waidla’s trial are, of course, physically available to us, and notice of their contents would be permissible under Evidence Code sections 452 and 459. (See
 
 People v. Hardy
 
 (1992) 2 Cal.4th 86, 134 [5 Cal.Rptr.2d 796, 825 P.2d 781].) But we would be unable to take notice of any factual explanations the trial prosecutor may have for any material inconsistencies we might find by comparing the transcripts of the two trials. Nor could we take notice of other extra-record evidence of the prosecutor’s state of mind. For example, defendant claims the prosecutor made a knowingly false argument when he told the jury, in this case, that the victim may
 
 *636
 
 have still been alive when she was dragged into the bedroom. Defendant’s claim is based on the existence of contrary testimony and argument in the earlier Waidla trial, of which we could take notice. If we did so, however, we would still be unable to determine whether, in the period between the two trials, significant new evidence surfaced on this point (satisfying due process even under Judge Fletcher’s view in
 
 Thompson),
 
 the medical examiner reevaluated his opinion, or other events occurred such that the prosecutor, at the time of defendant’s trial, neither knew nor had reason to know his argument was false. As Judges Tashima and Kozinski observed in their
 
 Thompson
 
 opinions, the questions of which of two conflicting factual theories is true, or which the prosecutor believed or should have believed was true, might, in a habeas corpus proceeding, require reference to an evidentiary hearing. No such evidentiary proceeding would be available to the court and parties in this direct appeal.
 

 In short, this is an instance of the general rule that an appellate court should not take notice of matters not first presented to and considered by the trial court, where to do so would unfairly permit “one side to press an issue or theory on appeal that was not raised below.”
 
 (People v. Hardy, supra,
 
 2 Cal.4th at p. 134.) We therefore deny the request for judicial notice of the Waidla record; to take notice under these circumstances and for the purpose requested would be to augment improperly the appellate record. (See
 
 People
 
 v.
 
 Sanchez, supra,
 
 12 Cal.4th at p. 59, fn. 5.) Absent notice of the Waidla transcripts, defendant’s due process claim is without support.
 

 Defendant also contends his trial attorney rendered constitutionally ineffective assistance by failing to introduce, in the penalty phase, evidence of the medical examiner’s prior (Waidla trial) testimony that the victim was already dead when dragged to the bedroom and of the prosecutor’s prior argument to that effect and to the effect that Waidla was the dominant partner and had inflicted the three blows with the hatchet blade. For reasons similar to those above, we do not reach the merits of this claim on direct appeal. (See
 
 People
 
 v.
 
 Mendoza Tello
 
 (1997) 15 Cal.4th 264, 268 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) The evidence defendant insists should have been introduced does not, of course, appear in the appellate record before us. Although we could take notice of the testimony and argument in Waidla’s trial, we would still be without any procedure for further supplementing the record with any tactical considerations trial counsel might offer to explain his decision or with any explanatory testimony Dr. Ribe, the medical examiner, might have given. For example, had defense counsel recalled Dr. Ribe at the penalty trial, as defendant suggests he should have done, and examined him regarding his prior opinion that the victim’s abrasions, caused by being dragged along the carpet, were postmortem, we
 
 *637
 
 do not know whether Dr. Ribe would have simply repeated that opinion, contradicted it, or explained or qualified it. Similarly, had trial counsel successfully sought to introduce into evidence portions of the prosecutor’s Waidla trial argument, we have no way of determining in this appeal what additional explanations or qualifications, from within or without the Waidla record, the prosecutor might have introduced in rebuttal. “Rather than attempt to glean inferences from a record where the critical questions were . . . unasked,” we leave the merits of this issue for consideration, if therein presented, on petition for writ of habeas corpus. (Ibid.; see also
 
 People
 
 v.
 
 Smithey, supra,
 
 20 Cal.4th at p. 1012.)
 

 XIII.
 
 Trial Court’s Direction to Defense Counsel Limiting Argument on Penalty
 

 After refusing a proposed instruction that the jurors, if they found the aggravating circumstances to outweigh the mitigating circumstances, may, “but need not,” return a death verdict,
 
 [12]
 
 the court, at prosecution request, advised defense counsel he would not be permitted to argue to the same effect. Specifically, the court said, “You may not argue, Mr. Blum, that if in fact the jury finds the aggravating outweigh the mitigating that they give life without parole.” Counsel replied, “Of course not.”
 

 Although trial counsel’s response suggests he had no desire or intention to argue that the jury could return a sentence of life without parole even if they found the aggravating circumstances outweighed the mitigating, defendant now contends the court “precluded” counsel from so arguing and thereby deprived him of his Sixth Amendment right to effective assistance of counsel and his Eighth Amendment right to reliable penalty phase procedures. For the proposition that counsel should have been permitted to argue for life even if the jury found the aggravating circumstances outweighed the mitigating, defendant cites
 
 People
 
 v.
 
 Myers
 
 (1987) 43 Cal.3d 250 [233 Cal.Rptr. 264, 729 P.2d 698],
 
 People
 
 v.
 
 Duncan
 
 (1991) 53 Cal.3d 955 [281 Cal.Rptr. 273, 810 P.2d 131],
 
 People
 
 v.
 
 Raley
 
 (1992) 2 Cal.4th 870 [8 Cal.Rptr.2d 678, 830 P.2d 712], and
 
 People
 
 v.
 
 Stansbury
 
 (1993) 4 Cal.4th 1017 [17
 
 *638
 
 Cal.Rptr.2d 174, 846 P.2d 756], reversed on other grounds in
 
 Stansbury v. California
 
 (1994) 511 U.S. 318 [114 S.Ct. 1526, 128 L.Ed.2d 293]. From the principles outlined in those cases, however, it is clear the trial court here committed no prejudicial error.
 

 In
 
 People v. Myers, supra,
 
 43 Cal.3d at page 276, the lead opinion stated the penalty jury’s obligation is “not simply to determine whether aggravating factors outweigh mitigating factors and then impose the death penalty as a result of that determination, but rather it is to determine, after consideration of the relevant factors, whether under all the circumstances ‘death is the appropriate penalty’ for the defendant before it.” The jury here was so instructed—they were told they must determine from all the circumstances which penalty was “justified and appropriate” (see
 
 ante,
 
 p. 637, fn. 12)—and nothing in the court’s direction precluded defense counsel from so arguing. Indeed, counsel, without objection, told the jurors they could apply “whatever moral or sympathetic value you feel appropriate,” that they could show mercy and sympathy, that for a death verdict the aggravating circumstances must “so substantially” outweigh the mitigating “that it warrants death,” and that they were not to return a death verdict unless they believed, from all the circumstances, that execution of defendant was “the proper thing to do.”
 

 In
 
 People v. Duncan, supra,
 
 53 Cal.3d at page 979, the court observed that under our law “[t]he jury may decide, even in the absence of mitigating evidence, that the aggravating evidence is not comparatively substantial enough to warrant death.”
 
 People
 
 v.
 
 Raley, supra,
 
 2 Cal.4th at page 921, and
 
 People v. Stansbury, supra, 4
 
 Cal.4th at page 1065, quote that passage from
 
 Duncan
 
 with approval. Again, the jury here was informed, by both argument and instructions, of the principle that the weighing process involved was a normative process and that to return a death verdict they must find the aggravation to be of sufficient substance to warrant that punishment. They were instructed to return a death verdict only if they found “that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.” (See
 
 ante,
 
 p. 637, fn. 12.) Nothing in the court’s direction to counsel precluded him from so arguing, and, indeed, he did so at length and without objection; “The worst of the worst deserve the death penalty. This is a very serious crime, but we save the worst of the worst for the worst, and we’ll get into that later.
 
 ... To return a judgment of death, you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death. That’s a very important word, ‘so substantial. ’ To me, it means a lot more than one outweighs the other. It has to substantially outweigh the other. In other words, the factors for death have to be so substantially greater than the mitigating circumstances that—and if
 
 
 *639
 

 that isn’t true, then you’re not to give death.
 
 It’s the law, and I’m sure you want to follow that law.” (Italics added.)
 

 Thus, the jurors in this case were amply informed, by instruction and argument, that they were to be guided by the listed aggravating and mitigating circumstances, but were free to assign those factors the moral and sympathetic value they deemed proper, and were to return a death verdict only if, considering all the circumstances, the aggravation was so substantial in comparison with the mitigation as to make death the appropriate penalty. This is the weighing process as our cases describe it; beyond this process of normative comparison, no distinct additional step is required to determine the proper penalty.
 
 (People
 
 v.
 
 Boyde
 
 (1988) 46 Cal.3d 212, 254 [250 Cal.Rptr. 83, 758 P.2d 25]; accord,
 
 People
 
 v.
 
 Raley, supra,
 
 2 Cal.4th at pp. 920-921.)
 

 XIV.
 
 Argument and Instruction on Prison Conditions and Meaning of Life Without Parole
 

 Defendant contends the trial court, by sustaining objections to defense counsel’s penalty phase argument and refusing an instruction on the sentence of life without parole, deprived him of a fair opportunity to rebut the prosecutor’s argument on certain points in violation of his rights under the due process clause and the Eighth Amendment. We take his claims one by one.
 

 First, defendant complains the court sustained an objection and instructed the jury to disregard a portion of his counsel’s argument discussing other murderers, assertedly worse than defendant, who were or were not sentenced to death; this was proper argument, defendant contends, as rebuttal to the prosecutor’s argument that the present murder was more brutal than a simple felony murder.
 

 Contrary to defendant’s current contention, his trial attorney was in fact permitted to, and did, argue substantially in rebuttal to the prosecutor’s point. Without objection, counsel argued this crime was not “the worst of the worst” compared to other murders and that the death penalty should be saved for “the cold-blooded killers, ... the mass murderer, the brutal assassin ... the cold-blooded drive-by killers of children . . . .” When counsel mentioned other special circumstances subjecting murderers to the death penalty (“A person previously convicted of a murder. A person who kills two or more people, killing law enforcement officers and other government officials in connection with their duty”), the court sustained a prosecutorial objection, but did not strike the argument or instruct the jury to ignore it.
 
 *640
 
 Only when counsel invoked Charles Manson and Sirhan Sirhan, “who live today,” did the court admonish the jury, “[t]he argument of Mr. Blum as to the present status of Charles Manson and Sirhan Sirhan is improper, and you must not consider it for any purpose on the issue of penalty in this case >5
 

 The court “did not err in excluding references to the notorious but unrelated crimes of Charles Manson or to the penalty of life imprisonment that he ultimately received.”
 
 (People v. Sanders
 
 (1995) 11 Cal.4th 475, 555 [46 Cal.Rptr.2d 751, 905 P.2d 420].) The same holds for the reference to Sirhan Sirhan. To the extent the court erred in sustaining an objection to the argument that some other special circumstances define worse crimes than this felony murder, no prejudice appears, under any standard, as nothing in the record suggests counsel had additional argument on this particular point he was precluded from presenting, and counsel did, as we have seen, argue without objection that this crime was not as bad as many other types of murder.
 

 Second, defendant claims the court erred in precluding argument on conditions defendant would face in state prison were he sentenced to life without parole; such argument, he contends, was proper rebuttal to the prosecutor’s argument that he was likely to be a future danger because he had possessed shanks and a handmade handcuff key (a flattened paper clip) while in county jail awaiting trial.
 

 Again, the record does not support defendant’s contention his trial attorney was precluded from rebutting the prosecution argument by discussing prison conditions. Without objection, and in direct response to the prosecutor’s argument, trial counsel told the jury defendant had prepared himself for state prison by body building, because “[w]here he’s going he’s not going to have any knives. He’s not going to be in the county jail with people who have been charged with misdemeanors and drunk driving and things like that. He will be in maximum security in some of the toughest prisons in California, and believe me, they’re not going to tolerate any knives. I don’t think that’s anything that we have to worry about.” Only later in his argument, when counsel, in order to persuade the jury that defendant would be “adequately punished” by a life sentence, began to describe maximum security conditions in detail (“500 inmates per block in a two-man cell, one shelf to put your stuff on, there’s a little sink there. I believe that they don’t have any toilet seats on the toilets”), did the court sustain an objection and admonish the jury not to consider “the issue of prison conditions.”
 

 Because defendant contends only that argument on conditions of confinement was proper
 
 rebuttal
 
 on the question of future dangerousness, and
 
 *641
 
 because, as seen above, defense counsel actually made such rebuttal argument without objection, “we need not determine whether [additional evidence or argument on the severity of confinement] would have been admissible [or proper] as a ‘matter relevant to . . . [the] sentence.’ ”
 
 (People v. Mason
 
 (1991) 52 Cal.3d 909, 962 [277 Cal.Rptr. 166, 802 P.2d 950], ellipsis and final bracketed text in original.)
 

 Defendant relies upon a remark in
 
 People
 
 v.
 
 Daniels
 
 (1991) 52 Cal.3d 815 [277 Cal.Rptr. 122, 802 P.2d 906]. In the course of holding that Daniels’s proposed evidence on probable conditions of confinement was properly excluded at trial, we paraphrased
 
 People
 
 v.
 
 Thompson
 
 (1988) 45 Cal.3d 86, 139 [246 Cal.Rptr. 245, 753 P.2d 37] as stating that “[w]hile defendant might have an interest in telling the jurors of the horrors of execution or the rigors of confinement in order to impress upon them the gravity of their responsibility, that interest could be satisfied in his argument.”
 
 (People v. Daniels, supra,
 
 at pp. 877-878.) Defendant, however, does not contend his trial attorney’s additional argument on the unpleasantness of a maximum security cell was proper as an attempt to impress upon the jury the gravity of their decision, but only as rebuttal to the prosecutor’s future-dangerousness argument. It was irrelevant on that point, and, in any event, defense counsel had already made his rebuttal argument that in state prison defendant would not be able to carry shanks as he had in county jail.
 

 Finally, defendant contends the court should, in light of the prosecutor’s argument on future dangerousness, have given an instruction earlier proposed by the defense and rejected by the court, that “life without the possibility of parole means that defendant will never have a parole hearing and will never be released from prison.” Acknowledging that we have several times held such an instruction should not be given (see, e.g.,
 
 People v. Jones
 
 (1997) 15 Cal.4th 119, 189-190 [61 Cal.Rptr.2d 386, 931 P.2d 960], overruled on another point by
 
 People v. Hill
 
 (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673];
 
 People v. Thompson, supra,
 
 45 Cal.3d at pp. 129-131), even when the prosecutor has emphasized the defendant’s future dangerousness (see
 
 People v. Arias, supra,
 
 13 Cal.4th at p. 173), defendant contends the instruction was nonetheless required in his case because the prosecutor’s future-dangerousness argument was not limited to in-prison violence but mentioned defendant’s possible plans to escape. We see no material distinction from the above cases, however. If the prosecutor had improperly suggested defendant might be a future danger to the public at large because he could be
 
 paroled,
 
 defendant’s argument for an additional instruction might have some force. But the prosecutor’s reference to a possible future
 
 escape
 
 did not raise the issue of parole in any way, and thus did not require the court to give any special instruction on the subject.
 

 
 *642
 
 XV.
 
 Admission of Statement to Sheriff’s Detective Regarding Plan to Attack Gang Members
 

 Defendant contends the court erred in allowing, over his objection that the evidence was obtained in violation of
 
 Miranda
 
 v.
 
 Arizona
 
 (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974], Sheriffs Detective Edward Nordskog to testify that defendant,’ while in county jail awaiting trial, told him he had been “going to cut the throats of three gang members” with the shanks he surrendered to Nordskog. Consideration of defendant’s claim requires a detailed review of Nordskog’s testimony and the court’s rulings in regard to it.
 

 The court initially heard Nordskog’s testimony outside the jury’s presence in order to rule on defendant’s
 
 Miranda
 
 objection. Nordskog stated he had contacted defendant in the jail after receiving information defendant was in possession of shanks and “was planning to do a hit on somebody.” Without giving
 
 Miranda
 
 advisements, he asked defendant if he had any knives on him; defendant said he did and told Nordskog where they were. After collecting the knives, Nordskog took defendant back to his office and “conducted a lengthy interview,” the purpose of which was to find out if there were any more weapons or planned crimes, and to ensure jail security. During that interview, which again was not preceded by
 
 Miranda
 
 advisements, Nordskog asked if defendant was having problems with “the gangsters in the dorm.” Defendant said he was having serious problems and had planned “to kill at least three” members of the gang that had been giving him trouble.
 

 The trial court overruled defendant’s objection as to defendant’s response to Nordskog’s initial questions about knives, finding those statements—that he had two knives and where they were—within the “public safety” exception to
 
 Miranda
 
 (see
 
 New York v. Quarles
 
 (1984) 467 U.S. 649 [104 S.Ct. 2626, 81 L.Ed.2d 550]), but sustained the objection as to anything said in the interview that followed in Nordskog’s office.
 

 Following that ruling, defense counsel suggested Nordskog also be permitted to testify that defendant said he was having problems with gangs. The court said defense counsel could ask that question, but warned he would thereby open the door to further testimony regarding the office interview, on the principle that when one party puts part of a conversation into evidence the other party may inquire into the whole of the conversation. (Evid. Code, § 356.) As the court explained: “[Y]ou’re trying to show that here poor Mr. Sakarias is a victim of gang violence and here he is being victimized, and you want me to excise the part where he says, ‘yeah, I want to use these
 
 *643
 
 knives to kill some other people.’ Well, I’m not going to do it.” If defense counsel asked about defendant’s statement regarding gangs, the court warned, “I will also then allow . . . [the prosecutor] to go into the rest of the conversation.” Defense counsel responded, “Well, obviously then I’m not going to ask that question.”
 

 On direct examination before the jury, Nordskog testified that in 1988 he was assigned to investigate security problems stemming from “gang activity inside the jail system.” He contacted defendant after receiving information he had illegal weapons. The possession of such weapons, Nordskog stated, “usually means-there is a fight about to occur, or there is going to be a hit or an attempted murder, or a murder, or something like that.” (Defendant did not object to this testimony.) Defendant admitted he had two shanks, and Nordskog found them concealed on defendant’s person. The prosecutor did not ask about the subsequent office interview.
 

 On cross-examination, the following colloquy ensued:
 

 “Q. [Defense counsel]: You were not investigating the defendant because you suspected he was involved in gang activity, were you?
 

 “A. [Nordskog]: Yes, I was.
 

 “Q: Well, did you find that he was involved in gang activity?
 

 “A: As a possible victim, yes.”
 

 On redirect, the prosecutor asked, “What did you suspect his involvement was?” Nordskog answered, “I had understood that he had been robbed earlier by force by several male Hispanics, and that he was attempting—he was going to do a hit on at least three of them.”
 

 The court, finding defense counsel had “opened the door” by inquiring into what Nordskog had learned about defendant’s involvement with gangs, denied defendant’s motion to strike this question and answer, and permitted the prosecutor to inquire further as to what defendant had said in the office conversation about gang activity. Continuing on redirect, the prosecutor asked what defendant said he was going to use the weapons for. Nordskog answered, “He said later that night he was going to cut the throats of three gang members in that dorm.”
 

 Defendant contends his trial attorney did
 
 not
 
 open the door to introduction of his Miranda-violative statements made in the office interview, because
 
 *644
 
 “defense counsel did not seek to introduce any of the statements that defendant made to Nordskog during the second interrogation. . . . Rather, defense counsel asked Nordskog if defendant was ‘involved in gang activity,’ i.e., was defendant a gang member. Defense counsel did not ask if defendant was a
 
 victim
 
 of gang violence; the deputy offered that information on his own, and it was not responsive to the question that counsel posed.” (Italics in original.)
 

 We cannot agree with defendant’s view of events. True, defense counsel’s first quoted question on cross-examination (“You were not investigating the defendant because you suspected he was involved in gang activity, were you?”) did not call for any statements defendant made in the office interrogation. But his next question (“Well, did you find that he was involved in gang activity?”) did call for such statements. Under the circumstances as known to counsel from Nordskog’s testimony in the
 
 Miranda
 
 hearing, Nordskog could only have “f[ou]nd” whether defendant was involved in gang activity from the office interview, which concerned that exact topic. Although counsel may not have expected Nordskog’s exact answer (defendant argues the expected answer was simply “no”), by asking Nordskog about what he had learned from defendant’s statements in the office interview, counsel opened the door, under Evidence Code section 356, to a fuller exploration of the contents of those statements. In effect, defense counsel asked the very question he earlier indicated he would not ask. The trial court did not err in allowing redirect examination on the same subject.
 

 XVI.
 
 Insufficient Notice of Evidence in Aggravation
 

 Defendant contends he was given inadequate pretrial notice that the prosecution intended to rely on the flattened paper clip found in his shoe while he was in jail as evidence of an escape plan. He claims the lack of such notice violated section 190.3 and his right to due process.
 

 Defendant concedes that a police report provided in the pretrial notice included a description of the paper clip, but argues that “the bare reference to the discovery of a paper clip in defendant’s shoe was insufficient to notify defense counsel” of an escape argument. The record, however, does not support defendant’s characterization of the notice as containing only such a “bare reference.” Rather, as counsel acknowledged in discussion of this point during trial, the police report explicitly noted that bent and flattened paper clips of this sort are commonly used to open handcuffs. We agree with the trial court that such a reference, especially together with notice that two shanks were found at the same time as the paper clip, gave defendant a reasonable opportunity to prepare a defense
 
 (People
 
 v.
 
 Arias, supra,
 
 13
 
 *645
 
 Cal.4th at p. 166) to the prosecution’s use of the paper clip as evidence defendant planned a possible escape by force.
 

 XVII.
 
 Prosecutor’s Implied Comment on Defendant’s Failure to Testify
 

 Defendant contends the prosecutor’s argument that defendant had not expressed true remorse for the killing constituted an implied comment on defendant’s choice not to testify in his own defense, in violation of
 
 Griffin v. California
 
 (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106]. We find no such implied comment in the prosecutor’s argument.
 

 Dr. Carlin, the defense psychiatrist, testified at the penalty phase that when she asked defendant what he thought about what had happened, he answered, “ T don’t think it should have happened. We were stupid. We were drunk. I have a lot of remorse. It would be better to tie him’— emphasize him—‘up and take his life savings and split from the country.’ ”
 
 [13]
 

 In obvious reference to this testimony, the prosecutor argued to the jury: “Again, remorse. The defendant expressed a possible factor in mitigation. Did he say he was sorry, but only sorry that he got caught? Not a significant factor in mitigation. When he expressed his remorse, ‘We should have just tied her up and taken her life savings and split the country.’ Again, a selfish concern only for his own well-being, never expressing a type of remorse, ‘I’m sorry I did it, I’m sorry I caused pain.’
 
 With two years of reflection, no evidence of that type of remorse.”
 
 (Italics added.)
 

 The italicized phrase, defendant argues, must have referred to defendant’s failure to testify, rather than to Dr. Carlin’s interview, because Dr. Carlin last interviewed defendant in February of 1990, only 19 months after the July 12, 1988, killing. We observe, however, that the evidentiary portion of defendant’s trial took place during September and October of 1991, more than
 
 three
 
 years after the killing, making it unlikely the prosecutor’s “two years” referred specifically to that period. From the context, moreover, even the italicized comment would naturally be taken to refer to what defendant had or had not said to Dr. Carlin. Finally, even if the prosecutor’s remarks could be taken more broadly to refer to defendant’s failure to show true remorse
 
 at any time
 
 through trial, they would not impliedly refer to his
 
 *646
 
 failure to testify, as defendant discussed the crimes and his attitudes toward them with Deputy Pirozzi during the trial itself. The record, therefore, does not show a reasonable likelihood
 
 (People
 
 v.
 
 Clair
 
 (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705]) the jury would have understood the prosecutor’s argument as a comment on defendant’s failure to testify.
 

 Posttrial Issues
 

 XVIII.
 
 Court’s Denial of Continuance for New Trial and Modification of Sentence Hearing
 

 The penalty verdict was returned November 4, 1991. Defense counsel (Daniel Blum) was unable to attend because he was in court elsewhere, but another deputy public defender stood in for him. With the agreement of both parties, hearing on the automatic motion for modification of sentence (§ 190.4, subd. (e)), and sentencing itself, was set for December 5, 1991, 31 days later.
 

 On December 5, Blum appeared, but immediately asked for “a few more days to prepare.” He stated he had just returned from a two-week vacation and had spent the previous day reviewing the trial record in order to prepare a motion for new trial; he also stated he had just “one minute ago” received the probation and sentence report, and had not had time to review it with defendant. The court denied the request, stating: “You’ve known about this sentencing quite a while. I believe you spoke with my court reporter and told my court reporter you would be ready today.” The court did, however, allow counsel until 10:30 a.m. to prepare (the record does not show at what time court initially convened).
 

 Defendant contends the court abused its discretion in denying a continuance when counsel in a capital case was unprepared to argue for a new trial and modification of sentence, and a short continuance would not have prejudiced the People or disrupted the orderly administration of justice. He also contends the court’s refusal “cause[d] defense counsel’s conduct to be ineffective,” requiring reversal.
 

 The determination of whether a continuance should be granted rests within the sound discretion of the trial court, although that discretion may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare.
 
 (People v. Hawkins
 
 (1995) 10 Cal.4th 920, 945 [42 Cal.Rptr.2d 636, 897 P.2d 574];
 
 People v. Maddox
 
 (1967) 67 Cal.2d 647, 652 [63 Cal.Rptr. 371, 433 P.2d 163];
 
 People v. Fontana
 
 (1982) 139 Cal.App.3d 326, 333 [188 Cal.Rptr. 612].) By that standard, no abuse of
 
 *647
 
 discretion appears here: defense counsel had ample opportunity to prepare before (or during or instead of) his vacation, made no complaint during that period—indeed, he apparently indicated he would be ready—and later gave no explanation as to why he had not used the time available to prepare. Nor has defendant shown that the lack of a continuance rendered his attorney’s assistance constitutionally ineffective. The record demonstrates neither that counsel performed below the standard of a reasonably competent attorney in arguing the new trial and modification motions, nor that the single additional step defendant asserts should have been taken was reasonably likely to affect the result.
 
 [14]
 

 (People
 
 v.
 
 Ledesma
 
 (1987) 43 Cal.3d 171, 217-218 [233 Cal.Rptr. 404, 729 P.2d 839].)
 

 XIX.
 
 Trial Court’s Refusal to Hear Mitigating Evidence Not Presented to Jury
 

 Defendant contends the trial court erred by refusing, in ruling on the automatic motion for modification of sentence (§ 190.4, subd. (e)), to consider any evidence not presented to the jury. He suggests that the court’s ruling hampered counsel’s attempt to argue defendant was less culpable than Waidla in the killing. Once again, defendant’s claim is at odds with the record.
 

 Defense counsel opened his argument on modification with a question: “Is the court allowed to consider anything outside the actual evidence that was presented on an issue of mitigation?” The court answered: “No, I am not. I can only consider . . . facts in issue presented to the jury.”
 

 Counsel proceeded to argue that Waidla was the more culpable actor: unlike defendant, Waidla “had no mental defects,” his “lack of gratitude” and “chutzpah” were greater because the Piirisilds had done more for him, and he “virtually gave no cooperation to the police, whereas the defendant was cooperative after he was caught and made a complete confession . . . .”
 

 Counsel then returned to his earlier question about extra-record argument, leading to the following exchange:
 

 “Mr. Blum [defense counsel]: ... I don’t think the jury properly weighed the issue of remorse. I think that there—I don’t know if I’m allowed—the
 
 *648
 
 reason I was asking about being able to say anything that’s outside of the evidence is—
 

 “The Court: Tell me, I’ll listen to what you have to say.
 

 “Mr. Blum: All right. I was not here for the taking of the verdict. My supervisor was here in my place. He told me that he spoke to the jurors afterwards and they considered that defendant’s lack of remorse was a major issue.”
 

 Counsel went on to argue that lack of remorse was not a proper basis for a death verdict because it was not supported by the evidence and because it amounted to punishing defendant for his failure to testify. The trial court disagreed on both grounds (observing that evidence of defendant’s lack of remorse had been introduced in rebuttal and had been argued only to show absence of a mitigating factor, not as a factor in aggravation) and reminded counsel that in deciding the modification motion the court was required independently to weigh the mitigating and aggravating circumstances, rather than to evaluate the jury’s deliberations. In stating its reasons for denying the modification motion, the court did not mention defendant’s remorse or lack thereof.
 

 In ruling on the automatic modification motion, the court is required to “review the evidence” and, considering the statutory factors in aggravation and mitigation, determine whether the jury’s weighing of those factors in favor of death is “contrary to law or the evidence presented.” (§ 190.4, subd. (e).) We have repeatedly held that the court’s decision is to be based only on the evidence presented at trial. (E.g.,
 
 People v. Beeler, supra,
 
 9 Cal.4th at p. 1006;
 
 People
 
 v.
 
 Edwards
 
 (1991) 54 Cal.3d 787, 847 [1 Cal.Rptr.2d 696, 819 P.2d 436];
 
 People v. Marshall
 
 (1990) 50 Cal.3d 907, 942 [269 Cal.Rptr. 269, 790 P.2d 676].) Defendant contends this rule must give way to the federal constitutional principle that a capital sentencer may not be precluded from considering mitigating evidence
 
 (Skipper v. South Carolina
 
 (1986) 476 U.S. 1 [106 S.Ct. 1669, 90 L.Ed.2d 1]), a principle that defendant, citing
 
 Espinosa v. Florida
 
 (1992) 505 U.S. 1079, 1081-1082 [112 S.Ct. 2926, 2927-2929, 120 L.Ed.2d 854] (capital sentencing court may not rely on invalid aggravating circumstance), contends applies to the sentencing court as well as the jury.
 

 We need not decide here whether a trial court must, in ruling on an automatic motion for modification, consider new mitigating evidence proffered by the defense. In this case, the court did not refuse to hear any mitigating evidence proffered by the defense. When defense counsel indicated, for the second time, that he was unsure what he could and could not
 
 *649
 
 present, the court asked to hear the evidence. In response, counsel presented no new mitigation, instead arguing that the jurors’ postverdict comments suggested they emphasized defendant’s lack of remorse in their deliberations. The trial court did not refuse to hear this argument, though it disagreed with counsel’s claim that lack of remorse was an improper subject for the jury. The record, therefore, simply does not support defendant’s claim that defense counsel attempted, and was precluded from, bringing before the court mitigating evidence not presented to the jury.
 

 XX.
 
 Consideration of Waidla’s Probation Report
 

 Because Waidla was sentenced prior to defendant’s modification hearing and the same judge presided in both cases, defendant claims the trial court must have considered information from the probation officer’s report prepared for Waidla’s sentencing in denying defendant’s motion for modification of sentence. Consideration of the Waidla report, defendant contends, violated his due process and Eighth Amendment rights because, defendant asserts, the report was not available to his trial attorney (see § 1203.05 [limiting availability of probation reports to nonparties]); defendant claims he was thereby sentenced on the basis of information he did not have a full opportunity to confront or rebut. (See
 
 Gardner
 
 v.
 
 Florida
 
 (1977) 430 U.S. 349 [97 S.Ct. 1197, 51 L.Ed.2d 393] [capital sentencing based in part on confidential portion of the defendant’s presentence investigation report, which was not disclosed to defense counsel, violated due process].)
 
 [15]
 

 The record, however, provides not the slightest reason to suppose the trial court here relied upon or considered the Waidla report in denying defendant’s modification motion. To the contrary, the court expressly stated it had not considered even
 
 defendant’s
 
 probation report on the issue of the capital sentence. The Waidla report was not mentioned by the court or any party at the modification hearing. Although the court had presumably read the Waidla report some months earlier in connection with the noncapital portion of Waidla’s sentencing, “there is nothing in the record to suggest that the court relied on anything other than the evidence before the jury”
 
 (People
 
 v.
 
 Holt
 
 (1997) 15 Cal.4th 619, 694 [63 Cal.Rptr.2d 782, 937 P.2d 213]) in denying defendant’s modification motion.
 

 
 *650
 

 Gardner v. Florida
 
 is readily distinguishable. The trial judge there stated for the record that his decision in favor of a death sentence was “based on the evidence presented [at trial], the arguments of counsel, and his review of ‘the factual information contained in said pre-sentence investigation.’ ”
 
 (Gardner v. Florida, supra,
 
 430 U.S. at p. 353 [97 S.Ct. at p. 1202], quoting trial record.) The high court found Gardner was denied due process of law “when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain.”
 
 (Id.
 
 at p. 362 [97 S.Ct. at p. 1207].) As we have just seen, however, the record in the present case provides no support for an assumption defendant’s death sentence was based, in any part, on the Waidla probation report.
 

 Disposition
 

 The judgment is affirmed.
 

 George, C. J., Mosk, J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied May 24, 2000.
 

 [1]
 

 Unless otherwise specified, all further statutory references are to the Penal Code.
 

 [2]
 

 At oral argument, defense counsel suggested a defendant could be prejudiced by the allocation to him of the burden of proof on restoration of competency even if he had not contested or attempted to rebut the state’s evidence of competency because the trial court might independently find that evidence to be totally without probative value (in counsel’s phrase, “not worth the paper it is printed on”). However that may be, it is not what happened here; this trial court expressly stated it was “adopting] the findings of the Department of Mental Health,” a course of action inconsistent with a conclusion those findings were completely unsupported by credible evidence.
 

 [3]
 

 Relying on
 
 Beck v. Alabama
 
 (1980) 447 U.S. 625 [100 S.Ct. 2382, 65 L.Ed.2d 392], defendant contends the federal Constitution requires instruction on lesser included offenses in capital cases. However, as we pointed out in
 
 People v. Breverman, supra,
 
 19 Cal.4th at page 167, the high court held in
 
 Schad v. Arizona
 
 (1991) 501 U.S. 624, 647 [111 S.Ct. 2491, 2505, 115 L.Ed.2d 555], that
 
 Beck’s
 
 principles were satisfied if the jury was provided some noncapital third option between the capital charge and acquittal. Here the jury was provided with the noncapital option of first degree murder without special circumstances.
 

 [4]
 

 Defendant acknowledges that robbery and burglary do not, by their statutory definitions alone, necessarily include assault and trespass, respectively, but argues that where, as here, the robbery is alleged to have been effectuated by “force
 
 and
 
 fear,” and the burglary by an entry both “willful
 
 and
 
 unlawful,” the lesser offenses are necessarily included in the accusations of the greater. (See
 
 People v. Barrick
 
 (1982) 33 Cal.3d 115, 133-135 [187 Cal.Rptr. 716, 654 P.2d 1243] [lesser offense is within conjunctively pled greater charge if either of the conjunctively pled elements satisfies lesser offense].) The Attorney General disputes the point, relying principally upon
 
 People v. Birks
 
 (1998) 19 Cal.4th 108, 118, fn. 8 [77 Cal.Rptr.2d 848, 960 P.2d 1073] (accusation that burglary defendant “willfully and unlawfully” entered commercial building with larcenous intent did not necessarily include charge of trespass) and
 
 People v. Wright
 
 (1996) 52 Cal.App.4th 203, 210-211 [59 Cal.Rptr.2d 316] (accusation that robbery was committed by “force and fear” does not necessarily include charge of assault). Because we conclude there was no substantial evidence defendant entered the Piirisilds’ house or attacked Viivi Piirisild without the intent to steal, we need not address these points.
 

 [5]
 

 As noted, the prosecutor argued defendant was guilty of burglary, robbery and murder as a direct perpetrator. Defense counsel expressly conceded defendant’s guilt of first degree (premeditated and deliberate) murder, and impliedly conceded the two felonies, arguing solely for not-true findings on the special circumstances because reasonable doubt existed as to whether the felonies were incidental to the killing, and because the charged lying-in-wait special circumstance (on which the jury did not reach a verdict) was not shown because there was an interruption between the period of waiting and the attacE
 

 [6]
 

 Evidence Code section 1250 provides, in part: “(a) Subject to Section 1252, evidence of a statement of the declarant’s then existing state of mind, emotion, or physical sensation ... is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the
 
 *629
 
 declarant’s state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action . . . .”
 

 [7]
 

 Counsel asked rhetorically whether the evidence showed defendant intended to kill or to rob Viivi Piirisild. He answered his own question: “Obviously they intended to kill her, that’s what they were there for.” Later in the argument, he observed the jury could “safely” find premeditation based on the physical evidence and “the defendant’s own statement as to his prior intent to kill.”
 

 [8]
 

 Section 786 provides that if property taken in one jurisdictional territory has been brought into another jurisdictional territory, the courts of either territory have jurisdiction over, among other offenses, any burglary or theft involved in the taking. Section 502.7, subdivision (f) provides that jurisdiction over theft of telephone services lies in the territory where the call originates or terminates or the territory where the bill is sent or would have been sent.
 

 [9]
 

 Of the 11 judges participating, only four, including Judge Fletcher, joined part III of her opinion, discussing the inconsistent-theories problem. Three other judges concurred in the judgment and in parts I, II and IV of Judge Fletcher’s opinion.
 
 (Thompson
 
 v.
 
 Calderon, supra,
 
 120 F.3d at p. 1047 (hereafter sometimes
 
 Thompson).)
 

 [10]
 

 Judge Kozinski’s opinion also addresses the distinct problem of inconsistent
 
 verdicts,
 
 where under the facts of the case “A and B cannot both be guilty,” yet they are both convicted in separate trials.
 
 (Thompson
 
 v.
 
 Calderon, supra,
 
 120 F.3d at p. 1071 (dis. opn. of Kozinski, J.).) Inconsistent prosecutorial argument does not necessarily result in inconsistent verdicts, since it may be possible for both A and B to be guilty of the crime even though the theories of guilt urged by the prosecutor in the two trials are inconsistent. In the present case, for example, defendant does not contend that if Waidla was guilty of capital murder he was not, or vice versa.
 

 [11]
 

 A similar view appears to underlie the concurring opinion of Judge Clark in
 
 Drake v. Kemp
 
 (11th Cir. 1985) 762 F.2d 1449, 1470-1479. One or both of two men, Campbell and Drake, had robbed and murdered a barber in his shop. Campbell testified at his own trial that Drake was the sole assailant; the prosecutor successfully argued he was lying and that the two together, or Campbell alone, had struck the fatal blows. At Drake’s trial, however, the same prosecutor called Campbell as his main witness to obtain a conviction and death sentence against Drake. Judge Clark found “[t]he conclusion . . . inescapable that the prosecutor,” having “destroyed Campbell’s credibility” in the earlier trial, then “obtained Henry Drake’s conviction through the use of testimony he did not believe . . . .”
 
 (Id.
 
 at pp. 1478-1479.)
 

 In another case, dissenting from the denial of certiorari, Justice Stevens of the United States Supreme Court suggested a constitutional violation may also exist as to the earlier-tried defendant, that is, when the prosecutor, at a subsequent trial, embraces as true a theory of events against which he explicitly argued at a capital defendant’s trial. Justice Stevens’s concern appears to have been less with the fairness of the earlier trial than with the constitutional permissibility of the state executing a man the prosecutor now believes is innocent.
 
 (Jacobs
 
 v.
 
 Scott
 
 (1995) 513 U.S. 1067 [115 S.Ct. 711, 130 L.Ed.2d 618].) In the present case, defendant does not contend the prosecutor’s behavior in Waidla’s trial shows he believes defendant is innocent of the capital murder.
 

 [12]
 

 Defendant does not complain on appeal of the instruction’s having been refused. (See
 
 People v. Hines
 
 (1997) 15 Cal.4th 997, 1070 [64 Cal.Rptr.2d 594, 938 P.2d 388] and
 
 People
 
 v.
 
 Beeler
 
 (1995) 9 Cal.4th 953, 997 [39 Cal.Rptr.2d 607, 891 P.2d 153] [both upholding rulings refusing similar proposed instructions].) The court in the present case instructed the jury with CALJIC No. 8.88 (1989 rev.), telling them, among other things, that “[t]he weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side,” that they must “determine under the relevant evidence which penalty is justified and appropriate,” and that to return a death judgment each juror must be persuaded “that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.”
 

 [13]
 

 Despite the use of the masculine pronoun, defendant may have been referring to Viivi Piirisild. According to a stipulation provided the jury, the Estonian language contains no distinction between masculine and feminine in its third person pronouns. Defendant sometimes confused “him” and “her.” In his taped statement to police, for example, defendant initially said that when Viivi Piirisild opened the door, Waidla hit “him” on the head; at the detective’s prompting, defendant amended the pronoun to “her.”
 

 [14]
 

 The only concrete argument defendant makes for ineffective assistance is the claim that trial counsel, because of the continuance, failed to produce a copy of the Waidla trial transcript in order to show that Waidla was the actual killer and that the prosecutor pursued inconsistent theories in the two cases. His largely unarticulated argument fails to persuade us that reasonably competent counsel would necessarily have presented such an argument, that defense counsel Blum would have done so had he taken more time to prepare, or that such an approach bore a reasonable probability of inducing the trial court to grant the new trial or modification motions.
 

 [15]
 

 Defendant also complains that the trial court, during preparation of the appellate record, refused to augment the record with the Waidla probation report, “which defendant has been precluded from seeing to this day.” The relationship of this complaint to defendant’s claim that his sentence was unconstitutionally based on secret materials is unclear. In any event, we note that, although the trial court did deny the requested augmentation, the appellate record nevertheless includes a copy of the Waidla probation report. The report, which begins at page 2686 of the clerk’s transcript, is contained in a supplemental volume of that transcript, marked as volume X and mailed to appellate counsel, according to a clerk’s stamp, on November 22, 1996.