Filed 5/23/13  P. v. Henderson CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LISA MARIE HENDERSON,<br><br>    Defendant and Appellant. | A131646<br><br>(Contra Costa County<br>Super. Ct. No. 5-101013-1) |

Lisa Marie Henderson was convicted by a jury of possession of methamphetamine for sale (Health & Saf. Code, § 11378), imposition of sentence was suspended, and she was granted probation, conditioned on her completion of a 180-day residential drug treatment program.  She contends there was no substantial evidence to support a conclusion that she possessed methamphetamine, and that the conviction must be reversed because of instructional and evidentiary errors.  We reject her arguments and affirm.

## I.  FACTS

A.  <u>Search of the Residence</u>

On the morning of December 4, 2009, Concord police officers executed a search warrant at a home on Atlantic Street looking for methamphetamine and evidence of methamphetamine sales.  Ron August, who was renting the house, was the target of the investigation.  In a total of 24 hours of surveillance over the previous four months, Henderson had been seen coming and going from the house at least five times.

1

When police knocked on the front door and announced their presence, the door was ajar and swung open. They entered, detained Henderson in the kitchen, and detained August leaving the master bedroom, down the hall from the kitchen. The other bedrooms in the house were occupied by August's son and daughter, who were not at home.

In an open drawer of a desk in the master bedroom, the police found 5.89 grams of methamphetamine, a scale, three pay-owe notebooks, and Henderson's driver's license depicting the Atlantic Street address.[1] Other desk drawers contained a business letter addressed to Henderson at Atlantic Street, and a marriage certificate showing that she and August were married in October 2009. Other items in the bedroom included two glass pipes on the desktop, another scale, baggies for drug packaging, $4,780 in cash in a safe; $670 in cash on the desktop; a police scanner, a pistol, two stun guns, and three cell phones, one of which was used by Henderson.

B. Henderson's Police Interview

Henderson and August were arrested and interviewed. August admitted that he was selling drugs, that he had regular clients, and that the stun guns, scales, and baggies in the bedroom were used in connection with the sales. We hereby grant Henderson's motion to augment the appellate record with the transcript of her interview. Quotations from the interview are taken from the transcript, and we have viewed the videotape of the interview to confirm the transcript's accuracy.

In her interview, Henderson said that she had known August for about two years. She stayed at the Atlantic Street home, and with her father at an address on Willow Pass. She had not made any money since January 2009, and was relying on August and her father for financial help. She was not living with August because of problems in their relationship, but had clothes and duffel bags at his house.

Henderson reported that she used methamphetamine after meeting August, "daily sometimes." August gave her methamphetamine and they smoked it together. When

---

[1] At the preliminary hearing, the lead investigator testified that the driver's license was found in a purse on the kitchen table. He had a different recollection at trial, and his police report stated that the license was found in "the master bedroom top desk drawer."

asked about the methamphetamine and gun recovered in the search, she responded, "I don't know nothing about a gun." When she denied that the drugs were hers, she was asked, "Well, when you use, does Ron provide you with drugs? [¶] [A.] Yes. [¶] [Q.] Okay. So you're aware that they're there. [¶] [A.] Yes."

When the questions turned to selling drugs, the following conversation ensued: "[Q.] . . . Basically I found enough of what I was looking for to lead me to believe that Ron, and/or you, or both of you are selling drugs, specifically methamphetamine. Uh, so I'm just going to ask you straight up, are you selling any drugs, are you brokering any deals as the middleman, are you, um, if someone comes and is making any purchase, even a small amount, or a large amount, are you, do you have any interaction with that? [¶] [A.] Yeah, some small amounts, yeah, sometimes. I mean, not very often, but . . . [¶] [Q.] What is, like, give me an example of what kind of interaction or involvement you might have. [¶] [A.] Um, I've collected money before from people . . ., stuff like that. And that's about it. [¶] [Q.] Okay. And is that to, as a favor to Ron, or how does it work out so that you end up dealing with that? [¶] [A.] Like if he's not there. [¶] [Q.] Okay. So you know where his stuff is, you know how to weigh it out and exchange money for it if, if he's not there right? [¶] [A.] I know how, yes. [¶] [Q.] Okay. Umm . . . [¶] [A.] Well, I don't know about the weigh it out. I don't do . . . . [¶] [Q.] Okay, um, but if someone tells you, hey, you know, I mean what kind of . . . . [¶] [A.] No, usually I just collect money, usually. [Q.] Oh, so people that like owe him? [¶] [A.] Yeah. [¶] [Q.] Okay, so if they come by because Ron has given out dope— [¶] [A.] I guess so. [¶] [Q.] —or I guess the term would be if he's fronted dope to someone and they owe, they'll come by and make a payment? [¶] [A.] Sometimes, yeah. [¶] [Q.] Okay, so you know where that money's coming from or why it's coming to the house? [¶] [A.] Yeah."

After discussion of Henderson's methamphetamine use, the questions returned to selling drugs: [¶] "[Q.] How much money do you think Ron, um, makes over the course of a week from selling methamphetamine? [¶] [A.] I wouldn't know, he wouldn't let me know, I wouldn't know, I don't have a clue. [¶] [Q.] Well, I mean, just from the money

that you see coming in when he's gone, like when people pay him, like you know, paying off debts or whatever. [¶] [A.] Oh, I mean, I wouldn't even, maybe, I only see hundreds, I mean, I don't even know, I mean, I'm not allowed to know that kind of stuff, too much, you know? [¶] [Q.] Okay. Um, we found some records, like pay-owes, you know, documentation, some of it looked like it might have been in, like, female handwriting? [¶] [A.] Mmm-hmm. [¶] [Q.] Is that, is that your handwriting? [¶] [A.] Mmm-hmm. [¶] [Q.] Is that just you keeping track so that you can tell him, you know, so that . . . . [¶] [A.] No, I just transfer it to a book for him. I just transfer it to, you know, a . . . book for him. [¶] [Q.] Okay, okay. Um . . . . [¶] [A.] Some of [that]'s been here since I've known him, since before I've known him. Some of those people I don't even know."

C. Defense Case

Henderson testified at trial in her own defense. She said that August always had methamphetamine, and she used the drug with him nearly every time she saw him. She moved out of Atlantic Street in early November 2009. She had moved out more than 20 times, but kept returning in the hope that he had stopped selling methamphetamine. She listed Atlantic Street as her address with the Department of Motor Vehicles because she planned to "[s]ometimes" stay there. She only received her "driver's license and maybe a couple other pieces" of mail at Atlantic Street. She had nothing in the house on the day of the arrests other than her purse, cell phone, and a scarf. August was paying for the cell phone, and had taken it away from her when she moved out in November.

She went to the house a couple of times after Thanksgiving to see August's son and daughter. On the morning of December 4, she went there because August called her. She talked to his daughter, and gave his son a ride. She did not go into the master bedroom or see the drugs found by the police. She did not know where August kept his methamphetamine, and did not know that he was selling it on that date.

She testified that she accepted money on August's behalf only twice, in 2008, after she moved in with him in June of that year. When she said in her interview that she saw "hundreds" of dollars coming in from August's drug sales, she was referring to the money she received for him on those two occasions.

4

She testified that the pay-owe notebooks recovered in the search did not contain her handwriting. She said in her interview and at trial that August had a construction business, and clarified at trial that when she said in her interview that her handwriting was in his pay-owe documentation, she was referring to records for the construction business, not the drug sales. But the interview had progressed well beyond the subject of August's construction business when she was asked about her handwriting in the notebooks, and she acknowledged during cross-examination that she told the officer about her handwriting when his questions pertained to selling methamphetamine.

Henderson said that August kept her only cell phone after she moved out in November 2009, and she denied sending him a text message on November 25. She also denied that her problems with August around the time of the arrest involved infidelity rather than drug selling. She did not send August a text message on November 25 saying that she loved him and wanted him to be her mate or nothing at all.

Henderson's father testified that she was living with him on the day of her arrest. He admitted that she was staying elsewhere one or two nights a week. He said "[i]t varied," depending on "how they [she and August] were getting along."

D. People's Rebuttal

In response to Henderson's testimony about text messages, the prosecution presented evidence that August received text messages from "Lisa" on November 25 and December 3, which were read to the jury. A November 25 message said, "[Y]ou just want a fuck buddy and not a mate. And no marriage is needed for a fuck buddy. And I love you and want you to be my mate or nothing at all." Other messages later that day said, "[Y]ou have been with someone. I have been with no one," and "I am with [her nephew] Cody right now and I have not spent the night with anyone." A December 3 message said, "I'm back in town. Do you still want me to come over?"

## II. DISCUSSION

A. Substantial Evidence

Henderson contends that the jury had no substantial evidence from which to find that she possessed the methamphetamine police recovered at Atlantic Street. "To

5

determine sufficiency of the evidence, we must inquire whether a rational trier of fact could find defendant guilty beyond a reasonable doubt.  In this process we must view the evidence in the light most favorable to the judgment and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence." (*People v. Johnson* (1993) 6 Cal.4th 1, 38.)

"Actual or constructive possession is the right to exercise dominion and control over the contraband or the right to exercise dominion and control over the place where it is found.  [Citation.]  Exclusive possession is not necessary.  A defendant does not avoid conviction if his right to exercise dominion and control over the place where the contraband was located is shared with others.  [Citations.]" (*People v. Rushing* (1989) 209 Cal.App.3d 618, 622.)  " 'The inference of dominion and control is easily made when the contraband is discovered in a place over which the defendant has general dominion and control:  his residence [citation], his automobile [citation], or his personal effects [citation].' " (*People v. Busch* (2010) 187 Cal.App.4th 150, 162; see also *People v. Redrick* (1961) 55 Cal.2d 282, 287 [finding of possession was supported by "the fact that the drug was found among defendant's personal effects"].)

An inference of possession could be readily drawn here.  The methamphetamine was found among Henderson's personal effects in a home where she resided, at least part of the time.  Her driver's license was in the drawer where the drugs was located.  The drawer was in a desk that contained business correspondence addressed to her.  The desk was in a bedroom where her cell phone was found.  The bedroom was occupied by the man she had married a few weeks earlier.  She had clothes and duffel bags in the house.  She was there when the warrant was executed.  Under the circumstances, whether she had dominion and control over the drugs was a jury question.  Her arguments to the contrary are meritless.

Henderson first disputes whether she had access to the drugs.  She relies on *People v. Mitchell* (1975) 53 Cal.App.3d 21, 25, where "proof amount[ing] to no more than a speculative possibility that [the defendant] had an opportunity of access to a place where the amphetamines were kept" was held "insufficient to support a finding of possession."

6

She suggests the prosecution had to prove where August customarily kept the drugs, and presumes he would generally have kept them locked away from the children who lived in the house. She claims "there is no evidence that August kept his methamphetamine anywhere other than a locked location in his bedroom—i.e., a locked desk drawer, or his safe—at any time when others might have had access to the bedroom." But this claim ignores the situation when the warrant was executed. Henderson was home alone with August, and the drugs were not locked up. She apparently had easy access to them when the police arrived.

Henderson next contends that there was no substantial evidence that she was living with August on the day of the search. "Consequently," Henderson maintains, she "would have had no access to his master bedroom unless he granted it, and there is no evidence he did." But she had recently married August, and his address was on her driver's license. She told police that she stayed at the Atlantic Street address as well as with her father. When she was asked in the interview whether it would be "safe to say" that she was living "to an extent" on Atlantic, she answered: "Well, just, I don't know if you noticed but if you noticed my stuff was, there's like a few clothes hanging up in the closet and I have some duffel bags. That was just, I don't know if I was on my way in or on my way, I don't know what I'm doing, if I'm on my way in or out. I really don't." She was asked, "And you've been quasi living there [at Atlantic Street], bouncing back and forth between you and your father's house for the last two years since you've known him?" She answered, "Since I've known him, yeah. Not just my dad's. I lived in Martinez, I lived, yeah, I went back to my [former] husband, I've been everywhere." Henderson's father testified that she stayed with August when she and August were getting along. The evidence supported a finding that Henderson was living at least part time with August when the drugs were found.

Henderson notes that she could not be found in possession of the drugs solely because she received some of them from August for her personal use. As she puts it in her briefing, "a drug pusher giving a user a controlled substance in small quantities for personal use does not create an inference that the user has dominion and control over the

7

pusher's sale stash." But the point is immaterial because the evidence of her dominion and control over the drugs did not relate to only her personal use.

Henderson observes that a person can aid and abet a sale of contraband without having dominion and control over it. (See, e.g., *People v. Murphy* (2007) 154 Cal.App.4th 979, 984 [sale can be brokered of a controlled substance within the exclusive possession of another; possession is not an essential element of the sale offense].) She admitted collecting money for August's drug sales and, contrary to her argument, effectively admitted in her interview that she assisted with his pay-owe sheets for the sales. But while those were the extent of her specific admissions, she also said in her interview "*usually* I just collect money." (Italics added.) Her answer suggests that sometimes she had additional involvement in the sales, which could have included handling the drugs themselves. In any event, a finding of dominion and control did not hinge on proof of her involvement in drug sales. She could have possessed the drugs with the expectation that August would sell them for her. She had motives to do so because she used the drugs, and their sale provided income to someone who was helping her financially.

To the extent Henderson can be taken to argue that, even if possession of the drugs was established, no intent was shown to possess them for sale, that argument would also fail. Given the quantity of the methamphetamine and all of the indicia of drug dealing, ample evidence established that the drugs were possessed for sale.

B. Jury Instructions

The court without objection instructed the jury pursuant to CALCRIM No. 207: "It is alleged that the crime occurred on or about December 2009. The People are not required to prove that the crime took place exactly on that day but only that it happened reasonably close to that day."[2] Henderson argues that the instruction was improper in this case. We disagree.

_____

[2] According to the reporter's transcript, the court misread the first sentence of the instruction, omitting to state that the crime was alleged to have happened on or about December 4. However, the rest of the instruction referred to a particular day, the jury

8

The instruction should not be given "when the evidence demonstrates that the offense was committed at a specific time and place and the defendant has presented a defense of alibi or lack of opportunity." (Bench Notes to CALCRIM No. 207 (2012) p. 42.) "Ordinarily, the People need not plead the exact time of commission of an alleged offense. (Pen. Code, § 955.) However, if the defense is alibi or . . . lack of opportunity to commit the offense, the exact time of commission becomes critically relevant to the maintenance of the defense. An instruction which deflects the jury's attention from temporal detail may unconstitutionally impede the defense. The defendant is entitled as a matter of due process to have the time of commission of the offense fixed in order to demonstrate he was elsewhere or otherwise disenabled from its commission." (*People v. Barney* (1983) 143 Cal.App.3d 490, 497.)

We agree with Henderson that "the potential flaw in an 'on or about' instruction isn't limited to defenses that technically constitute alibi or lack of opportunity. It can arise any time the instruction permits the jury to convict the defendant of an uncharged offense." We also agree with her that she was charged "only with possession for sale of the 5.89 grams of methamphetamine found in August's house on December 4, 2009." Defense counsel told the jury that Henderson was "charged with the methamphetamine that was found in that photograph, the baggie on December 4, 2009," and the prosecutor never suggested otherwise. However, we disagree with Henderson that the illegal act of possession "either happened or didn't happen on December 4, 2009." The drugs she was charged with possessing did not necessarily arrive at the house on December 4 and, given the evidence of her comings and goings, she might have been in the home along with those drugs on some earlier date. Thus, the jury was properly allowed to consider whether the unlawful possession might have occurred "reasonably close" to December 4.

---

knew from the court's reading of the charges that the information alleged a crime committed "on or about December 4, 2009," and the prosecutor noted in closing argument that the "charge date" was on or about December 4, 2009. Thus, the jury would not have been misled into thinking that the instruction pertained to a month, rather than a day, and Henderson does not argue otherwise.

9

CALCRIM No. 207 was properly given and did not expose Henderson to conviction of an uncharged offense.

Henderson argues that the court erred by failing sua sponte to give a unanimity instruction. "When a defendant is charged with a single offense, but there is proof of several acts, any one of which could support a conviction, either the prosecution must select the specific act relied upon to prove the charge, or the jury must be instructed that all the jurors must agree that the defendant committed the same act or acts. [Citation.] When the prosecutor does not make an election, the trial court has a sua sponte duty to instruct the jury on unanimity." (*People v. Mayer* (2003) 108 Cal.App.4th 403, 418.) No unanimity instruction was required here because a single illegal act was alleged and proven: possession, on or about December 4, 2009, of the methamphetamine found by the police on that date.

C. Evidentiary Ruling

Henderson argues that the court erred when it sustained the prosecution's hearsay objection to testimony that August was "very adamant" during his police interview "that he does not let Miss Henderson know about his enterprise." Henderson contends that when the prosecution introduced evidence of statements by August during his interview, it "opened the door, under Evidence Code section 356, to a fuller exploration of the contents of those statements." (*People v. Sakarias* (2000) 22 Cal.4th 596, 644.) Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party . . . ."

The lead investigating officer, testifying for the prosecution as an expert on the possession of methamphetamine for sale, opined that the notebooks recovered in the search were pay-owe sheets used in drug trafficking. His opinion was based in part on amounts shown on the sheets as owed to someone August identified in his interview as his supplier. In cross-examination of the officer, the defense elicited further details August provided in his interview about his sales operation. But when the defense asked

10

about August's denial of Henderson's involvement, the prosecution's hearsay objection was sustained.

"Application of Evidence Code section 356 hinges on the requirement that the two portions of a statement be 'on the same subject.' " (*People v. Vines* (2011) 51 Cal.4th 830, 861.) While " ' "courts do not draw narrow lines around the exact subject of inquiry" ' " (*ibid.*), the statute "is not applied mechanically to permit the whole of a transaction to come in without regard to its competency or relevancy." (1 Witkin, Cal. Evidence (5th ed. 2012) Circumstantial Evidence, § 39, p. 415.) August's statement that he did not let Henderson know about his drug sales was irrelevant to the portion of his interview the prosecution introduced regarding his supplier. Since the statements could reasonably be found to concern different subjects, the court did not err in excluding August's exculpatory remark about Henderson's involvement.

Any error in excluding the remark would have been harmless in any event. It is not reasonably probable that the verdict would have been different because August said that Henderson was unaware of the drug dealing she admittedly facilitated. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

### III.  DISPOSITION

The judgment is affirmed.

_____
Siggins, J.

We concur:

_____
McGuiness, P.J.

_____
Pollak, J.

11