Filed 10/16/24  P. v. Fredenburg CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>BRETT ROGERS FREDENBURG,<br><br>  Defendant and Respondent. | 2d Crim. No. B327710<br>(Super. Ct. No. VA149931)<br>(Los Angeles County) |

Brett Rogers Fredenburg appeals a judgment following conviction of second degree murder with findings of personal deadly and dangerous weapon use, and a prior strike conviction. (Pen. Code, §§ 187, subd. (a), 189, 12022, subd. (b)(1), 667, subds. (b)-(i), 1170.12, subds. (a)-(d).)[1]

In February 2019, Fredenburg beat and stabbed to death a homeless man who cheated him in a heroin transaction.  On appeal, Fredenburg raises claims concerning jury instructions not given, the effectiveness of counsel, and admission of his recorded

---

[1] All statutory references are to the Penal Code unless stated otherwise.

jail conversations into evidence.  We reject his contentions and affirm.

*FACTUAL AND PROCEDURAL HISTORY*

Robert Gonzalez and his wife Michelle Gomez lived in a tent near Shoemaker Avenue in Cerritos.  Gonzalez and Gomez were heroin addicts who bought drugs from Fredenburg and his father, Jimmy Fredenburg.[2]

Casey Kehoe and his girlfriend lived in a tent near Gonzalez.  They were also heroin addicts who knew Fredenburg.  Kehoe later informed police officers that Gonzalez did not pay Fredenburg the full price for heroin by using sleight of hand when transferring cash.

In February 2019, Reyna Munoz and her boyfriend lived in a nearby homeless encampment.  Munoz later told police officers that Fredenburg claimed Gonzalez had cheated him in a drug transaction and that he intended to obtain the money owed him.

On February 6, 2019, Gomez asked Kehoe to buy drugs for her and Gonzalez.  Kehoe used Gomez's cell phone to call Fredenburg.  That afternoon, two men wearing hoodies and bandanas walked into the encampment.  Gomez recognized Fredenburg (whom she had seen and spoken with "a number of times before") but not the second man.  Fredenburg pointed a gun at Gonzalez, but Gomez could not tell if it was a real gun.

Fredenburg began yelling at Gonzalez, who responded that he had the money and would pay.  Fredenburg appeared disinterested.  He and the other man then attacked Gonzalez, punching him and throwing him to the ground.  Fredenburg and the other man also struck Gonzalez with sticks.  Gonzalez

---

[2] At times we refer to the parties by their first names not from disrespect, but to ease the reader's task.

2

attempted to defend himself by blocking the men's blows. He was smaller than Fredenburg, however, and the two assailants used the force of their combined weight against him.

Fredenburg then stabbed Gonzalez with a sharp object, possibly a screwdriver found lying on the ground. Gomez screamed for help and saw Kehoe and his girlfriend, but they did not offer to help. Gomez blamed Kehoe for summoning Fredenburg. Kehoe responded, "So what. That's what [Gonzalez] deserves." Gomez ran to a nearby warehouse and requested assistance; a warehouse employee called 911.

The attack and stabbing lasted a few minutes. Fredenburg and the second man then fled. Police officers later found a broken black BB gun by Gonzalez's tent.

Gonzalez suffered a fatal stab wound to his back that punctured his lung. He also suffered wounds to his upper and lower extremities that could have been caused by receiving a punch or throwing a punch. The stab wound was caused by a sharp object but police officers did not recover the weapon.

Kehoe and his girlfriend testified at trial that they did not see the attack on Gonzalez. Kehoe saw two men wearing bandanas walk by his tent but did not recognize them. When interviewed by police officers earlier, however, Kehoe stated that Fredenburg was one of the two men ("[I]t looked like [Fredenburg]. . . . It looked like his body shape"). He recognized Fredenburg as the assailants fled the crime scene.

Munoz informed police officers that Kehoe and his girlfriend watched the attack on Gonzalez. Munoz also stated that she recently lent Fredenburg a black BB gun.

*Surveillance Cameras, DNA, and Cell Phone Evidence*

Video surveillance cameras at the nearby warehouse captured a dark-colored vehicle with a cord across the trunk arrive near the homeless encampment at approximately 1:20 p.m. on February 6, 2019.  Two men left the vehicle, walked toward the encampment, and then returned to the vehicle.  When arrested on February 7, 2019, Fredenburg drove a dark-colored vehicle with a cord securing the trunk.  Fredenburg had bruises, cuts, and sores on his hands when arrested and explained to police officers that he was a drug user.

Police officers discovered cigarette remains in the area where the dark-colored vehicle had parked.  Fredenburg was a contributor to the DNA found on the cigarettes.

DNA testing of the broken BB gun found at the crime scene excluded Fredenburg as a contributor to DNA found on the gun trigger.

Near the time of Gonzalez's murder, a cell phone used by Fredenburg pinged from a cell phone tower near the crime scene.  Jimmy was the cell phone's subscriber.

*Recorded Jailhouse Conversations*

In recorded telephone conversations with his wife Jamie, Fredenburg admitted that he "fucked up," but stated that he believed the police had "no evidence" against him.  Fredenburg also asked concerning the whereabouts of his cell phone and Jamie responded that the police had it.

In a three-way telephone conversation with Jamie and Jimmy, Fredenburg reiterated that he believed the police lacked evidence of his involvement in Gonzalez's murder.  Fredenburg asked Jamie to find "the Buck" in his backpack and "get rid of

4

[it]." In a later conversation, Jamie confirmed that she understood and had complied.

On February 12, 2019, Fredenburg spoke with Jimmy who offered to "take care of [Gonzalez's wife]." Fredenburg responded "Yeah." On February 25, 2019, Fredenburg telephoned Jamie. She informed him that police officers had threatened her based upon the jail conversations. They also had arrested Jimmy.[3]

*Jamie's Testimony*

Jamie testified at trial that they owned a dark-colored sedan that others, including Jimmy, would use. She explained that the telephone call references to "Buck" referred to a sunglass case bearing antlers decoration that contained illegal drugs. Police officers arrested Jamie shortly after arresting Jimmy. She later pleaded nolo contendere to accessory after the fact.

*Conviction and Sentencing*

The jury convicted Fredenburg of second degree murder and found the personal deadly and dangerous weapon use allegation true. In a separate proceeding, Fredenburg admitted suffering a prior serious felony and strike conviction. (§§ 667, subd. (a), 667, subds. (b)-(i), 1170.12, subds. (a)-(d).)

The trial court sentenced Fredenburg to 31 years to life, consisting of a doubled 15-year term for second degree murder and a one-year term for the great bodily injury finding. The court struck the section 667, subdivision (a) serious felony conviction finding. The court also imposed various fines and fees, ordered victim restitution, and awarded Fredenburg 1,106 days of presentence custody credit.

Fredenburg appeals and contends that the trial court or defense counsel erred by: 1) not instructing regarding heat of

---

[3] Jimmy died in custody in 2021.

passion manslaughter; 2) not requesting a limiting instruction regarding a witness's criminal conviction and the witness's credibility; 3) not instructing regarding a witness's out-of-court statements; and 4) admitting evidence of his recorded jail conversations.

*DISCUSSION*

*I.*

Fredenburg argues that the trial court erred by not instructing regarding the lesser included offense of voluntary manslaughter based upon a heat of passion theory. He relies upon the evidence that Gonzalez had cheated him (as well as Jimmy on an earlier occasion), that Gomez testified that she heard yelling, and that Gonzalez's defensive wounds could have resulted from him fighting with the two men.

In criminal cases, the trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary to the jury's understanding. (*People v. Nelson* (2016) 1 Cal.5th 513, 538; *People v. Enraca* (2012) 53 Cal.4th 735, 758-759.) The evidence necessary to support a lesser included offense instruction must be substantial from which reasonable jurors could conclude that the facts underlying the instruction exist. (*Ibid.*) The substantial evidence requirement is not satisfied by any evidence, no matter how weak, but evidence from which a jury could conclude that the lesser offense, but not the greater, was committed. (*Nelson*, at p. 538.) We independently review whether the trial court should have instructed concerning a lesser included offense. (*People v. Dominguez* (2021) 66 Cal.App.5th 163, 175.) Doubts regarding the sufficiency of evidence to warrant a lesser included offense instruction,

6

however, must be resolved in favor of the defendant. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.)

The crime of murder may be reduced to voluntary manslaughter if the victim engaged in provocative conduct sufficient to cause an ordinary person of average disposition to act in the heat of passion, i.e., rashly or without due deliberation and reflection. (*People v. Schuller* (2023) 15 Cal.5th 237, 252; *People v. Enraca*, *supra*, 53 Cal.4th 735, 758-759; *People v. Gutierrez* (2009) 45 Cal.4th 789, 826 [" 'The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment' "].) "Heat of passion" is a state of mind created by legally sufficient provocation causing a person to act not from rational thought, but from an unconsidered reaction to the provocation. (*People v. Nelson*, *supra*, 1 Cal.5th 513, 539 [legally sufficient provocation eclipses reflection and causes a person to act without deliberation or judgment]; *People v. Beltran* (2013) 56 Cal.4th 935, 942 [a person who acts without reflection in response to adequate provocation does not act with the mental state required for murder].) " 'Adequate provocation and heat of passion must be affirmatively demonstrated.' " (*Gutierrez*, at p. 826.)

The heat of passion element of voluntary manslaughter has an objective and a subjective component. (*People v. Enraca*, *supra*, 53 Cal.4th 735, 759.) "Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Ibid.*) Subjectively, the accused must be shown to have killed while under the actual influence of a strong passion induced by such provocation. (*Ibid.*) The passion aroused need not be anger or rage, but can be any intense

7

emotion other than revenge. (*People v. Dominguez, supra*, 66 Cal.App.5th 163, 175.)

The trial court did not err by refusing the instruction because substantial evidence and reasonable inferences therefrom do not support it. (*People v. Thomas* (2012) 53 Cal.4th 771, 813 [lesser included offense instruction not required where there is no evidence that offense is less than that charged]; *People v. Dominguez, supra*, 66 Cal.App.5th 163, 175 ["A trial court must instruct on lesser included offenses when there is substantial evidence that the defendant committed the lesser offense instead of the greater"].)

Fredenburg offers only speculation as to provocation or a killing executed in rage. (*People v. Sakarias* (2000) 22 Cal.4th 596, 620 [speculation insufficient to warrant lesser included offense instruction].) There is no evidence or reasonable inferences therefrom that Gonzalez was the initial aggressor, that he argued with Fredenburg, or that he provoked Fredenburg immediately prior to the killing. Fredenburg borrowed a BB gun from Munoz and, accompanied by another man, approached Gonzalez. Gomez testified that Fredenburg began yelling at Gonzalez and was not interested in his offer to pay the debt. Fredenburg and his crime partner then attacked Gonzalez, punching him and beating him with sticks. Gonzalez attempted to defend himself but was physically smaller than Fredenburg. There is no substantial evidence that Fredenburg committed voluntary manslaughter rather than the greater offense of murder.

Failure to instruct on a lesser included offense that is *not* supported by *sufficient* evidence does not constitute fundamental unfairness or loss of verdict reliability resulting in federal

constitutional error. (*People v. Schuller, supra,* 15 Cal.5th 237, 243, 260, fn. 7; *People v. Holloway* (2004) 33 Cal.4th 96, 141.)

*II.*

Fredenburg argues that the jury should have received a limiting instruction that it was not to consider Jamie's nolo contendere plea to accessory after the fact as evidence of his guilt. He asserts that he did not receive the effective assistance of counsel due to counsel's failure to request such a limiting instruction. Relying on federal cases, Fredenburg claims that he was denied a fair trial for this reason.

Jamie testified at trial in her husband's defense. Defense counsel questioned her regarding her arrest, confinement pending trial, and eventual plea. The trial court sustained the prosecutor's objection to counsel's question regarding why she pleaded nolo contendere.

The jury was correctly instructed regarding the effect of a felony conviction and a witness's testimony. The court instructed with CALCRIM No. 316 that a witness's felony conviction or commission of a crime may be considered "only in evaluating the credibility of the witness's testimony." Further, the jury must decide the weight of the felony conviction or crime commission and whether that fact makes the witness less believable.

Our Supreme Court has rejected the argument that the trial court has a sua sponte duty to include specific instructions as to the effect of a co-participant's conviction. (*People v. Williams* (2013) 56 Cal.4th 630, 668 ["Because defendant cites no authority that the trial court had a duty to give a limiting instruction on its own motion, and because trial counsel failed to object to the admission of the pleas and failed to request a limiting instruction, we find no merit in this claim"].) The court

has affirmed this holding in *People v. Dalton* (2019) 7 Cal.5th 166, 254.

Moreover, Fredenburg has not established prejudice from the lack of a limiting instruction. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 691-692 [80 L.Ed.2d 674]; *People v. Mackey* (2015) 233 Cal.App.4th 32, 119.) The prosecution introduced evidence of Fredenburg's telephone conversations from jail and Jamie's involvement in concealing evidence. The conversations were incriminating as to both Fredenburg and Jamie. Eyewitness Gomez knew Fredenburg and identified him as the assailant who killed Gonzalez. It is not reasonably probable that Fredenburg would have obtained a more favorable result had the limiting instruction been given. (*Mackey*, at p. 119.)

## III.

Fredenburg argues that the trial court did not completely instruct regarding evaluation of out-of-court inconsistent statements uttered by witnesses Gomez and Kehoe. He also asserts his counsel was ineffective for failing to propose modifying or clarifying instructions.

The trial court properly instructed with CALCRIM Nos. 226 ["Witnesses"], 315 [Eyewitness Identification"] and 318 [Prior Statements as Evidence"]. As Fredenburg acknowledges, our Supreme Court has rejected the argument that a jury would believe that the standard instruction on evaluating witnesses does not apply to statements made out of court. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1167-1168 [defendant who believes clarifying instructions are necessary to inform jury how to evaluate out-of-court statements should request them].) "No reasonable jury would interpret [the instructions regarding

10

witnesses] in such a way as to preclude their applying [them] to their evaluation of all the evidence including the out-of-court statements." (*Id.* at p. 1168.) The court affirmed this holding in *People v. Lucas* (2014) 60 Cal.4th 163, 293, overruled on other grounds by *People v. Romero and Self* (2015) 62 Cal.4th 1, 53-54, footnote 19.

No reasonable jury would interpret the instructions as a whole to preclude the credibility evaluations of the witnesses' out-of-court inconsistent statements. Moreover, Gomez and Kehoe were witnesses at trial and we presume the jury applied the witness credibility instructions to all of their statements. The jury specifically received instruction from CALCRIM No. 318: "You have heard evidence of a statement that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways: [¶] 1. To evaluate whether the witness's testimony in court is believable; [¶] AND [¶] 2. As evidence that the information in those earlier statements is true." Fredenburg has not established prejudice from counsel's failure to propose modifying instructions.

*IV.*

Fredenburg contends that the trial court abused its discretion by admitting evidence of portions of his recorded jail telephone conversations with Jamie. He asserts that the conversations are irrelevant and unduly prejudicial pursuant to Evidence Code section 352. Specifically, Fredenburg points to conversations regarding his efforts to obtain private counsel and his plan to shield his children from knowledge that he was in jail.

Fredenburg acknowledges that his counsel did not object to the jail conversations on the grounds of relevance and prejudice.

11

He asserts that he did not receive the effective assistance of counsel for this reason.

Fredenburg has forfeited these claims because he did not object in the trial court. (*People v. Gurule* (2002) 28 Cal.4th 557, 602 [because defendant failed to assert this theory below, " 'the trial court had no opportunity to resolve material factual disputes and make necessary factual findings' "]; *People v. Jones* (1998) 17 Cal.4th 279, 299, fn. 1 [we will not reverse a judgment for error the trial court did not commit and that was not called to its attention].)

Forfeiture aside, Fredenburg has not established that he received the ineffective assistance of counsel. Decisions regarding evidentiary objections are tactical decisions to which courts will defer to trial counsel. (*People v. Lopez* (2008) 42 Cal.4th 960, 972 [deciding whether to object is inherently tactical and failure to object will rarely establish ineffective assistance of counsel]; *People v. Lancaster* (2007) 41 Cal.4th 50, 82 [defense counsel cannot be faulted for failing to object, a tactical decision that rarely establishes ineffective assistance]; *People v. Catlin* (2001) 26 Cal.4th 81, 165 [decision whether to object, move to strike, or seek admonition regarding testimony is highly tactical and depends upon counsel's evaluation of the gravity of the problem and whether objection or other responses would serve only to highlight the undesirable testimony].) Here counsel may have reasonably decided that objecting to Fredenburg's conversations with Jamie would serve to highlight the conversations. Counsel's decision was inherently tactical and does not constitute ineffective assistance of counsel.

Moreover, the conversations regarding retaining a private attorney and shielding the children from knowledge that he was

in jail could not have unduly prejudiced Fredenburg.  Evidence at trial established that Fredenburg sold and used drugs and he admitted to police that he was a drug user.  He informed Munoz that he intended to recover the funds that were owed to him and asked to borrow her BB gun.  His claim of ineffective assistance of counsel must fail.

*DISPOSITION*

The judgment is affirmed.
NOT TO BE PUBLISHED.


GILBERT, P. J.

We concur:


BALTODANO, J.


CODY, J.

Raul A. Sahagun, Judge

Superior Court County of Los Angeles

_____

Sandra Gillies, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.